**FONALLEDAS v. UNITED STATES**
(three cases).
Nos. 47703–47703–C.

United States Court of Claims.
Nov. 4, 1952.

Charles V. Imlay, Washington, D. C., Vicente M. Ydrach and Mr. Hugh R. Francis, San Juan, P. R., on the briefs, for plaintiffs.

Ralph S. Boyd, Department of Justice, Washington, D. C., James M. McInerney, Asst. Atty. Gen., Howard O. Sigmond, Department of Justice, Washington, D.C., on the briefs, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

MADDEN, Judge.

These three actions were brought to recover for the alleged taking of lands in Puerto Rico belonging to the plaintiffs. The actions were consolidated for the purposes of the trial, and this opinion will cover all three actions.

An Act of Congress of October 17, 1940, 54 Stat. 1198–1199, authorized the dredging of an additional channel in San Juan Harbor, Puerto Rico. The Act provided that the project should be prosecuted subject to the conditions set forth in H.Doc.No.364, 76th Cong., 1st sess. One of those conditions was:

"that local interests furnish, free of cost to the United States, when and as required, all lands, easements, and rights of way and spoil disposal areas for the initial work and for subsequent maintenance, and hold and save the United States free from claims for damages resulting from the improvement."

The Government of Puerto Rico conveyed to the United States two areas for the placing of spoil. The conveyance provided that these areas were to revert to the Government of Puerto Rico when they were no longer necessary for national defense.

The Secretary of War made a contract with the Standard Dredging Corporation for the dredging of the channel. Of the two spoil areas specified in the contract, spoil area A was immediately north of the lands of the plaintiffs. It was an area of mangrove swamps and submerged lands located on the eastern shore of San Juan Bay. Spoil area A was mapped by the Navy in accordance with the description contained in the deed from the Government of Puerto Rico. The Standard Dredging Corporation, as it was required by the contract to do, constructed sand bag dikes on the east and west sides of the area, but none on the south side, where the spoil area adjoined the lands of the plaintiffs.

As the dredging of the harbor proceeded, the mud, silt and salt water, dredged from the bay and carried by a pipe line from the dredges to the center of the spoil area, raised the level of the surface in the center of the area and flowed off in all directions. Finally it raised the level of the surface in the area above that of the plaintiffs' lands to the south and began to flow over those lands. The plaintiffs protested in writing to various Government officials and finally brought a suit in the United States District Court to enjoin the Standard Dredging Corporation from continuing its harmful operation. Prior to the return day of the suit, counsel for the United States advised counsel for the plaintiffs that dredging operations which would overflow the plaintiffs' lands would stop, that a drainage canal would be dug to drain off the salt water already accumulated on the plaintiffs' lands and afford future drainage. The canal was to run in a general east-west direction and a part of it would have to pass through the plaintiffs' lands. The plaintiffs' counsel gave the Government a letter of authorization to construct the canal. That letter, which is quoted in finding 11, contained this paragraph:

"It is expressly understood that this permit is granted without prejudice to any and all rights of our clients, or, in other words, it is expressly understood that our clients waive no rights whatsoever by reason of this permit."

The canal was thereupon constructed and the injunction suit was dismissed.

As shown in the findings, lands of the plaintiffs both north and south of the canal were covered with spoil, those to the north, of course, being buried the deepest. The digging of the canal, which was some 14 meters wide, not only submerged the land occupied by the canal, but made the plaintiffs' lands north of the canal inaccessible, and they will remain so until a bridge is built over the canal. The lands were pasture lands, worth about $650 per cuerda, on which plaintiffs maintained, in 1941, one thousand head of cattle. A cuerda is ninety-seven one hundredths of an acre.

Prior to the placing of the dredged materials on the spoil area, the lands of the plaintiffs had a natural drainage into and through the mangrove swamp into the bay. This drainage was permanently blocked by the deposit of the spoil. But the canal will afford drainage to the lands, if ditches are dug to the canal.

Possible methods of reclaiming the plaintiffs' lands from the effects of their permeation with salt are described in finding 23. The only method practically feasible is that of ditching, manuring, and waiting for the salt to be washed out and drained away by rainfall. Expert testimony, and the experience of the plaintiffs themselves in reclaiming their lands south of the canal, indicate that lands so affected can be reclaimed in about four years. The lands north of the canal were much more seriously affected and it will take about twelve years to reclaim them. The actual expense of reclaiming the lands south of the canal, and the probable expense of reclaiming those north of the canal, is shown in finding 28.

The Government urges that the history recited above does not spell out a taking for which the plaintiffs may recover in this court under the Tucker Act, 28 U.S.C.A. §

1491. It says that the provision in the statute authorizing the dredging that local interests furnish the spoil area negatives any authority on the part of agents of the United States to take land for the project. Therefore, it says, whatever the Government did, through the agency of the Standard Dredging Company or others beyond the lands furnished by the Government of Puerto Rico was a tort, over which this court has no jurisdiction and for which, we suppose, no right of action in any court existed at the time of the events here involved.

■■ As we have pointed out elsewhere, earlier decisions required that, in order for a taking to be the basis for a suit under the Tucker Act, the circumstances of the taking had to be such as to create a contract implied in fact by the Government, to pay for the thing taken. This doctrine in effect read out of the Tucker Act the provision added by that Act giving this court jurisdiction of "claims founded upon the Constitution". But recent authority gives that provision full effect. United States v. Causby, 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. Dickinson, 331 U.S. 745, 748, 67 S.Ct. 1382, 91 L.Ed. 1789. The problem is discussed in Foster v. United States, 98 F.Supp. 349, 120 Ct.Cl. 93, and in Cotton Land Company v. United States, 75 F.Supp. 232, 109 Ct.Cl. 816, 829 ff. We think, therefore, that if the Government, through the agency of the dredging contractor took the lands of the plaintiffs, the absence of statutory authority to do so would not put the citizen thus imposed upon beyond reach of relief. In addition, we do not construe the language of the document referred to in the authorizing statute as disabling the Government from doing what might be necessary to complete the projected work, but rather as requiring that the Government of Puerto Rico indemnify it against claims for damages resulting from the doing of the work. What rights the Government may have against the Government of Puerto Rico, and how it might enforce them, we do not consider.

■ We think that what was done in the instant case amounted to a taking of the plaintiffs' lands. Some of them were buried under mud and silt, others were flooded with salt water and permeated with salt. Their usefulness was destroyed, for various periods. Some of the lands were permanently submerged, in the canal. The lands north of the canal, in addition to having their usefulness temporarily destroyed by mud and silt and salt water, were rendered inaccessible. "A destruction for public purposes may as well be a taking as would be an appropriation for the same end." United States v. Welch, 217 U.S. 333, 339, 30 S.Ct. 527, 54 L.Ed. 787, cited with approval in United States v. General Motors Corp., 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311. The General Motors case also holds that the fact that the taking is temporary does not prevent it from being compensable under the Fifth Amendment.

■ The Government contends that the permission given by the plaintiffs for the construction of the canal was a waiver of any claims which the plaintiffs might otherwise have had for its construction and the harmful effects thereof. It seems to us that the statement in the written permission that "it is expressly understood that our clients waive no rights whatsoever by reason of this permit" is a complete answer to the Government's contention.

■ The Government objects to our Commissioner's method of arriving at the value of the interest in their lands which was taken from the plaintiffs. It says that the rental value is not the proper measure; that instead, the difference in the value of the lands before and after the Government's activities is the measure. But the harmful consequences of the work were temporary, hence the measure suggested by the Government would over-compensate the plaintiffs. We think that for the kind of a taking here involved, the rental value basis of compensation is the best available measure.

■ Our Commissioner, in his finding 29, has computed the full rental value of the lands for the periods required for their restoration to full usefulness. We think that their restoration will be, or has been, as to the lands south of the canal, gradual, and that they will have, or have had, a con-

siderable and increasing amount of usefulness during the period required for their restoration to full usefulness. For that reason we discount by one-third the rentals computed by the Commissioner.

The Government says that if the plaintiffs are paid their rentals values in a lump sum they will be getting most of their money before it would be due, on an annual rental basis, and therefore these sums should be discounted because of their prepayment. This suggestion is remarkable when we remember that the taking occurred in 1941 and no compensation has yet been paid. If rents had been paid on the lands south of the canal during the four-year period of their impaired usefulness, those rents would have been paid in 1941, 1942, 1943 and 1944. On the lands north of the canal, whose restoration required twelve years, they would have been paid annually from 1941 to 1952. It is now 1952. There is, therefore, no problem of prepayment of rent.

There is, however, the problem of how to compute interest as a part of just compensation. As to the land occupied by the canal, and the cost of the bridge, interest will be computed from July 1, 1941. As to the rental value of the lands south of the canal which, if paid on an annual basis, would have been paid for the period July 1, 1941 to June 30, 1945. An approximate average due date is July 1, 1943, and we award interest from that date. We likewise award interest on the costs of reclamation of those lands from July 1, 1943, since we suppose that those costs would have been paid out progressively during the period of reclamation. For the same reason we allow interest on the rental value of the lands north of the canal and on the cost of their reclamation from July 1, 1946. The rate of interest will be 4 percent, and interest will run to the date of payment.

The plaintiff, Jeronimo Fonalledas, is entitled to recover $1,196.00 plus interest thereon at 4 percent per annum from July 1, 1943 until the date of settlement. The plaintiff, Jaime Fonalledas, is entitled to recover $19,221.44, plus interest at 4 percent per annum on $4,197.44 from July 1, 1941; on $3,905.20 from July 1, 1943; and on $11,118.80 from July 1, 1946, until the date of settlement. The plaintiff, Rosa Fonalledas, is entitled to recover $23,194.00 plus interest at 4 percent per annum on $4,244.50 from July 1, 1941, on $227.50 from July 1, 1943, and on $18,722.00 from July 1, 1946, to the date of settlement. The interest in all cases is awarded, not as interest, but as a part of just compensation.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.