**Jay F. WILFONG, d/b/a Wilfong Poultry Farms**

v.

**The UNITED STATES.**

**No. 691–71.**

United States Court of Claims.

July 13, 1973.

Marion Edwyn Harrison, Washington, D. C., attorney of record, for plaintiff. E. Murray Tate, Jr., and Tate, Weathers & Young, Hickory, N. C., of counsel.

J. Hank Meshorer, with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG, and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed June 13, 1973, requesting that the court adopt the recommended decision of Trial Commissioner C. Murray Bernhardt, filed April 20, 1973, pursuant to Rule 134(h), as the basis for its judgment in this case since plaintiff has failed to file a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the decision,

as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, defendant's motion of June 13, 1973, is granted, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

BERNHARDT, Commissioner:

Plaintiff, the owner of a chicken farm in North Carolina complains that his property rights in the airspace superadjacent his farm, but below the 500-foot level above which a regulation [1] authorized by 49 U.S.C. § 1301(24) (1970) has decreed to be the public's free and navigable airspace, have been inversely condemned.[2] Plaintiff asserts that this · taking has been accomplished through overflights of military aircraft which crossed his property from October 3, 1969 to December 10, 1970, with sufficient frequency, noise and violence as to frighten and injure his flocks, disrupt and impair his commercial egg and poultry business, damage his henhouses, and thereby diminish the value of his ownership.

In principal, plaintiff's case rests on United States v. Causby, 328 U.S. 256, 66·S.Ct. 1062, 90 L.Ed. 1206 (1946) and its collateral judicial heirs. It differs from *Causby* and all others in that as a case of first impression it concerns level overflights originating from a distant source but on a fixed route readily subject to instant change, rather than the glide angle pattern of descent and ascent of aircraft arriving and departing from an adjacent permanent airport and thus crossing the land beyond the runway at varying but low elevations with inevitable certainty and frequency. The latter situation is discussed in Harvey, Land-

---

* Whereas the court adopts the Commissioner's separate findings of fact, which are set forth in his report filed April 30, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. 14 C.F.R. § 91.79(c) (Rev. January 1, 1967).

2. Inverse condemnation is a legal label for effective expropriation of private property, the sovereign acting indirectly without benefit of formal eminent domain proceedings in condemnation; thus, sovereign acts incompatible with an owner's present enjoyment of his property rights.

owners' Rights in the Air Age: The Airport Dilemma, 56 Mich.L.Rev. 1313 (1958).

To state the problem is to solve it. Even after establishing with some adjustments the bulk of his factual contentions and demonstrating passably the nature of damages alleged in an amount subject to further proof, the plaintiff cannot recover for two principal reasons: (1) his case sounds principally in tort over which this court lacks jurisdiction; and (2) his failure to prove timely complaints so that the Air Force could invoke its purported standard policy to abate the overflight nuisance by altering the trespassing route or raising the minimum flight altitudes.

The overflights in question were of Air Force reconnaissance jet aircraft operating from the Shaw Air Force Base near Sumter, South Carolina (many miles distant from plaintiff's North Carolina farm) pursuing a low level, high speed training route having a code name of Florence 47.[3] This route followed a roughly circular course over a broad geographical area of North and South Carolina. It was laid out to avoid crossing over congested areas, although, of course, it could not avoid passing over many habitations and farms. The route was plotted as a 10-mile wide corridor whose center line linked—in geometrically connected straight segments—simulated ground targets, so that the aircraft flew from target to target discharging their basic mission of training experienced pilots to take reconnaissance photographs of selected ground targets from low levels and at high speeds. Although the aircraft were supersonic types, there is no indication or charge that sonic booms are involved. The maximum speed permitted on the training flights was 552 m. p. h.

At the outset of the period of infringement the aircraft flew at heights ranging from 500 feet to 1,500 feet;

however, in response to plaintiff's complaints in March 1970, the 500-foot minimum altitude of the route leg crossing plaintiff's farm was raised to 1,500 feet, and again on May 5, 1970, to 2,000 feet. Finally, due to plaintiff's continued complaints, that leg of Florence 47 which crossed plaintiff's farm was moved 15 miles away as to most of Shaw aircraft on May 13, 1970, and as to all of them on June 11, 1970.

After June 11, 1970, it is reasonable to believe that the Air Force had completely abated the nuisance save for the possibility of a stray plane or two accidentally deviating from its revised route. Such deviations it is believed were *de minimis*, despite the plaintiff's contentions that the frequency of overflights was only slightly reduced after the route change and did not terminate completely until December 10, 1970. Thus, we are effectively concerned with infringing overflights from October 16, 1969 to June 11, 1970.

■ The consequences of the overflights to plaintiff's business during that shortened period are described in findings 20 through 23, *infra*. These findings are derived from the eye- and ear-witness testimony of persons in plaintiff's hire whose rustic artlessness would have made successful dissembling unlikely and the effort detectable. Our quarrel is not with the reality of cause and effect, but with the matter of causative permanence, an element of inverse condemnation through aerial trespasses that is prerequisite to recovery. It is not enough to constitute a Fifth Amendment taking that aerial trespasses be sufficiently low, loud and frequent as to interfere with the enjoyment of private property; they must also subject such enjoyment to a liability of intermittent interference that is either permanent or at least of a prospective duration so indefinite as to be constructively permanent.

3. Plaintiff alleges overflights from another training course route as well, Florence 46, but this route was too far from plaintiff's farm to be realistically considered as a source of frequent overflights.

The necessity for permanence or its equivalence may be analogized from rulings in cases relating to the taking of riparian property rights by permanent or periodic flooding occasioned by Federal dam projects. In United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L. Ed. 746 (1917), the altered flow of a river brought about by construction of a Federal dam caused plaintiff's property to become permanently subject to frequent overflows, and a Fifth Amendment taking was consequently found. There have been a number of comparable cases including United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903); Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933); United States v. Kansas City Life Ins. Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950).

The *Cress* line of authority is readily distinguishable from certain other flooding cases. The contrary cases involved generally a failure to prove the inevitability of recurrence of floods induced by a particular Federal project. In order for a taking to occur, the effect of such flooding must be permanent rather than simply a random event induced more by an extraordinary natural phenomenon than by Government interference. Thus, in National By-Products v. United States, 405 F.2d 1256, 1272, 186 Ct.Cl. 546, 575 (1969), the plaintiff failed to prove that floods which occurred in the late spring of 1964 would "inevitably recur." 405 F.2d at 1274, 186 Ct.Cl. at 578.

In its three successive decisions in North Counties Hydro-Electric Co. v. United States,[4] the Court of Claims denied plaintiff's claim of taking by refusing to find that construction of a dam on the Illinois River near Ottawa, Illinois, permanently subjected plaintiff's power plant to "intermittent but inevitably recurring overflows * * *" (170

Ct.Cl. at 247); despite the fact that the dam was shown to have produced ice jams which caused the flooding of plaintiff's power plant on three occasions between 1943 and 1960.

■ From these authorities we extract the principle that to support a Fifth Amendment taking via inverse condemnation there must be not only a Federal activity or project which is permanent in nature, but that such activity or project must impose on private property certain consequences which are themselves permanent, and that their recurrence is inevitable even if only intermittent. By "permanent" we include a servitude of indefinite duration.

■ The permanence factor establishing a Fifth Amendment taking is equally applicable to aerial invasions of private property by Federal action. In Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922), the Supreme Court instructed this court that, if the construction of a gun battery and intermittent firing of such batteries over a period of years evidenced an "abiding purpose" by the Government to fire projectiles over plaintiff's property whenever it saw fit, then the subordination of the property to such use would impose a servitude thereon constituting "an appropriation of property for which compensation should be made." The case was returned to the Court of Claims to determine whether the facts supported the allegations in the petition, which the Supreme Court deemed to be sufficient as pleaded to constitute a cause of action not subject to demurrer.

Borrowing the philosophy of *Portsmouth* as to the compensability of Government appropriation of airspace above privately owned land, the Supreme Court in United States v. Causby, *supra,* agreed with the Court of Claims that "a servitude had been imposed upon the

4. North Counties Hydro-Electric Co. v. United States, 70 F.Supp. 900, 108 Ct.Cl. 470 (1947); North Counties Hydro-Electric Co. v. United States, 151 F.Supp. 322, 138 Ct.Cl. 380, cert. denied, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957); North Counties Hydro-Electric Co. v. United States, 170 Ct.Cl. 241 (1965).

[plaintiff's] land" by frequent, low level flights over it which diminished its value, but remanded the case to make certain determinations including the facts as to "whether the easement taken was temporary or permanent." On remand the Court of Claims found there to be a compensable "temporary" taking for a 4½-year period (109 Ct.Cl. 768, 770 (1948)). The element of permanence is implicit if not expressly stated in many other avigation easement cases decided by this and other courts since *Causby.* Adaman Mutual Water Co. v. United States, 181 F.Supp. 658, 143 Ct.Cl. 921 (1958), based its finding that "The easements of flight taken by the defendant * * * are permanent in nature * * * " on the fact that the adjacent Air Force Base was a permanent military airport from which low and frequent overflights "are to be expected for the indefinite future." 181 F.Supp. at 660, 143 Ct.Cl. at 925. All discoverable avigation easement cases to date, except for those involving the sonic boom problem, are ones where the claimants lived near the end of a fixed runway of an established airport, so that arriving and departing aircraft would of necessity funnel across the claimants' property with inevitable frequency and at low altitudes so long as the runway was in use.

■ There is no comparable element of permanent or indefinite servitude in the case under review. The route selected for Florence 47 was infinitely flexible with respect both to location and minimum altitude, and the policy of Shaw Air Force Base where the flights originated was to respond to complaints promptly by altering the route or the altitude so as to abate the nuisance. Existence of this policy at Shaw is established by word as well as deed in the form of changes in altitude and route when first it became aware of plaintiff's complaints. Thus, where the trespass is terminable conveniently, quickly and at will, and the policy of prompt abatement is firm and followed in actual practice, even though there may be some damage it is consequential in nature and tortious in origin rather than a compensable taking under the Fifth Amendment.

■ It is also observed that the plaintiff failed to prove that he made complaints to the Air Force prior to March 1970, although the overflights commenced in mid-October 1969 and were quite clearly Air Force aircraft from Shaw. No recovery could be had without complaint and an opportunity given to the Air Force to abate the nuisance by removing its cause. We are puzzled by the plaintiff's failure to prove that he made complaints prior to March 1970. The fact that plaintiff was not reluctant to complain is shown not only by his vociferous and repeated complaints after March 1970, but also by the proof that he complained vehemently in the fall of 1969 to the operator of a nearby civilian airport concerning civilian aircraft which were allegedly buzzing his farm. Plaintiff, however, failed to prove that he made similar complaints to the Air Force starting in October 1969. Air Force records do not reflect any complaints from plaintiff either by written notations or by actions in adjusting the altitude or routing of Florence 47 flights.

If the plaintiff did complain to the Air Force from 1969 on—and it seems incredible that he would not have done so given the Air Force overflight consequences which the record suggests in that earlier period—he should have been able to verify the complaints by reference to telephone toll call records, or in some other way beyond his own bare testimony. We cannot find that he did complain merely because he logically should have. The Air Force witnesses from Shaw who should have had knowledge of plaintiff's verbal complaints if they had been made prior to March 1970, said emphatically that the first recorded complaints received from plaintiff were in March. We are inclined to accept that evidence in absence of better proof than the plaintiff supplied. The plaintiff's actionable period of over-

flights thus shrinks to roughly 3 months from sometime in March 1970 to June 11, 1970, when the route was removed. This brief period of time during which the Air Force endeavored to accommodate plaintiff's complaints represented nothing more than a tortious invasion of plaintiff's airspace rather than a compensable taking in a Constitutional sense.

Thus, plaintiff's claim on the separated issue of liability fails for the reasons assigned. The facts presented in considerable detail in the findings following this opinion go far beyond the requirements of the dispositive grounds in an excess of concern over plaintiff's rights, but no matter how they are weighed they cannot be compensated here. The petition must be dismissed.

CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

Davis, J., dissented and filed opinion in which Skelton and Bennett, JJ., joined.