Gustav BERENHOLZ, et al.

v.

The UNITED STATES.

No. 61–78.

United States Claims Court.

Nov. 23, 1982.

---

Patrick McLain, Kerr, Russell & Weber, Detroit, Mich., for plaintiffs.

Carol Lynn Green, Washington, D.C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge:

Plaintiffs in this action are owners of a parcel of land situated adjacent to Lake Erie in Monroe County, Michigan, just north of the village of Estral Beach, Michigan. Plaintiffs seek to recover for the loss of their land due to erosion and flooding allegedly caused by defendant's actions. Defendant, through the Army Corps of Engineers, removed a 35-ft. section of the dike protecting plaintiffs' property from Lake Erie in order to transport equipment across plaintiffs' land to effect emergency repairs on a dike protecting the north border of the village of Estral Beach. Plaintiffs contend that following the completion of these repairs, the removal of the equipment from plaintiffs' farm, and the replacement of the 35-ft. section in the plaintiffs' east dike fronting Lake Erie, the east dike gave way. As a result, plaintiffs' farm was, and remains to this day, flooded.

Defendant maintains that plaintiffs' claim sounds in tort and that they do not thus fall within the 28 U.S.C. § 1491 jurisdiction of this court. In addition, defendant suggests that any loss suffered by plaintiffs was caused by their failure to maintain their dike and the severe storms and flooding of 1972–73, and not the result of the impaired condition of the dike following the deliberate removal of a 35-ft. section by the Corps.

For the reasons set out below, it is concluded that the defendant's actions which resulted in a permanent flooding of plaintiffs' land amounted to an invasion of the plaintiffs' property rights and constituted a taking under the constitution, and plaintiffs are entitled to the fair market value of their property with interest.

### Facts

Plaintiffs Gustav Berenholz, Antonina Miller, and Moshe Z. Miller are land contract purchasers of the 168-acre parcel of realty in question that is located in the Township of Berlin, County of Monroe, State of Michigan, hereinafter "the property." The parcel in question, as well as the adjoining areas, including the Estral Beach area, a total of 640 acres in all, was owned by the Strong family for many years. The farm and the other acreage passed to Henry Strong upon the death of his father, John Strong. Henry kept the farm, but sold off the remaining property, including the Estral Beach acreage. Upon the death of Henry in 1946, his nephew, Fred Strong, inherited the farm.

**Location of Plaintiffs' Property
Relative to Village of Estral Beach**

As shown in the above sketch, the 168-acre farm lies directly north of the village of Estral Beach, Michigan, and is bounded on the north, south and east by earthen dikes, and on the west by Port Sunlight Road. The dike dividing plaintiffs' property from the village of Estral Beach is plaintiffs' south dike and the village's north dike. It will hereinafter be referred to as the "south dike." The eastern boundary of plaintiffs' land is a north-south line proceeding due south from the east end of the north dike to a point due east of the south dike. A section of dike runs along the north one-half of this boundary and then takes a dogleg bend to the west to join the

south dike, leaving a portion of plaintiffs' land outside the east dike. The "south dike" protected the northern portions of Estral Beach from flood water coming across plaintiffs' land and also protected plaintiffs' land if the flood waters were coming from the direction of the village. The "east dike" protected plaintiffs' land from the waters of Lake Erie.

The property at issue was originally marshland. In 1913, dikes were built around the property by Fred's grandfather, John. The dikes were made of clay which is abundantly found in the subsoil of the area. The north and south dikes were approximately one mile long and had a variable height, being highest at their eastern or Lake Erie ends and slowly descending as they approach the Port Sunlight Road boundary of the farm on the west. The east dike was about 1500 ft. long and about 6 ft. in height. Each of the dikes had a 30- to 40-ft. wide base and a 20- to 30-ft. wide flat upper surface. The top of the east dike was wide enough to accommodate a 14-ft. wide by 17-ft. long shanty which was in use for many years during Fred's recreational visits to the property for skating and hunting.

The elevation of the farm dropped from about lake level at Port Sunlight Road to 5–6 ft. below lake level at the east dike. The farm was made up of a clay loam type soil west of the drainage ditch, as shown in the above sketch, and of a mucky topsoil east of that ditch. Because of the high water table, the farm did not drain well. Each spring over 100 acres of the farm would be covered with several feet of standing water due to the thawing of accumulated snow and the usual spring rains. This water would, because of the poor drainage of the soil, have to be pumped off the farm. The pumping operation would start in late April or May of each year depending upon weather conditions. It would sometimes take up to 10 days of 24-hour continuous pumping to remove all of the standing water. Following this, some additional time would be necessary for the ground to dry out so that crops could be planted. Because the pumping and drying

out operations normally would not be completed before June, the type of crops which could be grown on this farm were limited. Over the years, soybeans, which could be planted in June and harvested as late as October or November, proved to be the most reliable crop.

The parcel had, beginning with John Strong in 1913 or 1914, continuously been used as a farm. Fred had successfully operated the farm from the time of his inheritance until he sold it. During the late 1940's he personally farmed the land, but because of a change in circumstances, in the early 1950's, Fred engaged Dale Reaume to farm the land for him. Mr. Reaume worked the farm and they shared the proceeds. This arrangement continued until the sale of the farm in September 1972.

For some 60 years the dike remained intact. In all of the years of its existence to the time of the action complained of, the dike had never leaked and had always effectively kept out the Lake Erie water. Several factors accounted for its durability. Expert testimony revealed that Lake Erie is the shallowest of the Great Lakes. It has a prevailing west-to-east wind which makes its eastern end deeper. The property is located at the western end of the lake, where the shallower depth diminishes wave action. The region is further protected from northeast winds by the topography of southern Ontario, which serves as a natural interruption of the fetch length (the distance of open water between the origin of the wind and the shore) to reduce the wave action at the shallow end. A large marsh area in front of plaintiffs' land had over the years been greatly reduced in size, and, at the time of the April 1973 flooding, was largely submerged. It nonetheless still served to abate wave action against the east dike. Additionally, the dike was covered with brush and a line of deciduous poplar trees, spaced at approximately 6- to 10-ft. intervals, whose roots served to hold the clay of the dike together, and strengthen it against the elements. Some of the trees had grown so large that they could not be encircled by an adult's out-stretched arms.

Smaller diameter trees and low growing brush grew between the larger poplar trees.

The only noted maintenance or repairs to the dike over its 60 years of existence was the sealing of a few 6-in. diameter muskrat holes by Fred Strong while his uncle was living on the property, and the repair of a trench, apparently dug by vandals, in the east dike in late 1971 or early 1972. There is conflicting testimony as to the size of this trench, but Dale Reaume stated that he repaired it himself with the help of some local boys. There is no testimony that the trench caused additional problems after it was repaired.

The events which gave rise to plaintiffs' present predicament began with the severe weather conditions of 1972–73. During November of 1972, rain and high winds from the northeast, the source of that area's worst storms, hit the Estral Beach area. The storm was so severe that the State of Michigan, following the flooding which occurred on November 13 and 14, declared Monroe County to be a disaster area. During the storm, water not only came over the south dike into the village, but muskrat holes also caused water to flow through that dike from plaintiffs' farm into Estral Beach. The residents of Estral Beach enlisted the aid of the Army Corps of Engineers to help repair the south dike. Using sand and Vulclay, a sand which expands when wet, they plugged the holes, and pumped the water out of the village. Problems with the dike continued, though, and on December 1, 1972, the village sought further assistance from the Corps. It requested that the dike be reinforced and built up to stop the continued seepage and to prevent future flooding.

In March of 1973, another storm hit Estral Beach and the county was again declared a disaster area. Fearful that the south dike would fail, residents commenced sandbagging and pumping operations. The condition of the south dike prevented truck travel over it. In late March, officials of the village met with Bill Phelps, a representative of the Corps of Engineers, to discuss the recurring problems with their dike.

It was decided that more extensive repairs of the plaintiffs' south dike were necessary to protect Estral Beach.

Because the condition of the south dike prevented the use of trucks, traveling along its top, to transfer equipment and supplies to the needed points, the engineers concluded that they would need a crane to make proper repairs to the dike. However, the only feasible way of getting a crane to the south dike in the first place, and thereafter having it available for use along the entire length of the dike, was by putting it on a barge in the lake and floating it across the standing water on plaintiffs' land. The barge was 35- to 40-ft. wide and drew about 3 ft. of water. Although the record indicates that the lake was quite high, the testimony does not indicate that the dike was damaged by the flood. The testimony also does not indicate that the previously discussed trench across the top of the east dike, that had allegedly been repaired by Dale Reaume, had reappeared. Indeed, it is quite clear that the only way defendant could have gained access to plaintiffs' land from Lake Erie required breaching the east dike to the extent necessary to float the barge through it.

Defendant sought permission from Mr. Henry Miller, father of one of the plaintiffs, to breach the dike, and also requested that he sign a waiver of liability for any and all damages which might be caused by the repair work. On advice of counsel, Mr. Miller refused to sign the waiver, but, appreciating the exigencies of the situation and upon assurances that the dike would be returned to its previous condition, gave verbal permission for defendant to enter the property. The Corps contracted with Brown Marine and Excavating Company of Flat Rock, Michigan, to make the repairs to the south dike, and Bill Phelps selected the section of the dike that was to be breached to allow passage of the barge and crane.

On April 3, 1973, the contractor began to cut through the dike. Several trees had to be removed to accomplish this task. A breach, approximately 35-ft. wide and deep enough to give the barge about 6 ft. of

water, was made. The contractor's own words, which describe the extent of the damage done to the dike, are most telling on this very important point. Mr. Nelson Brown testified during cross-examination as follows:

Q [By plaintiff's attorney] You told us yesterday, Mr. Brown, that when you dug through the dike the first time, the breach or the hole that was created gave you six feet of water. Do you recall that testimony?

A Yes; when we went through we had about six foot.

Q And the barge drew how much?

A The barge draws about three and a half.

Q Why did you dig down two and a half feet more than three and a half?

A Because you can't control, really, digging that close with a dragline, and we always give ourselves a little bit of extra.

Q So, you give yourself a 2½ foot cushion; is that your testimony?

A When we had that amount of water, the bottom of the channel [the breach] was about the depth of the field; so we didn't go lower than the field.

In effect, this establishes that the contractor, in order to gain access to plaintiffs' farm, excised a 35-ft. section of the 1500-ft. long east dike, to the depth of 6 ft., or the full height of the clay dike.

There was as much as 5–6 ft. of standing water on plaintiffs' property at the time the barge entered. The contractor spent about 1½ to 2 hours cutting through the dike. Once through, the barge was moved by a tug to the south dike where repairs commenced.

The dike remained open for approximately a month. Much of this time was spent repairing the south dike. However, several days during this period were occupied moving rocks to the Estral Beach lakefront for the Corps. Another storm hit the area on April 9, requiring evacuation of the village. On April 25, the contractor's records show that the barge and crane took refuge from bad weather in the more protected area inside plaintiffs' property. Before the breach was closed, the barge and crane had passed back and forth through the breach point several times.

The contractor's business records reflect that the barge finally exited from the property on May 7, 1973. At the time of final exit from the property, the level of the water had dropped some 18 to 24 in. However, no additional digging was needed to ensure sufficient clearance for the barge to pass through.

The 35-ft. long and 6-ft. high gap in plaintiffs' dike was closed with the clay which had been removed from the dike during the breach operation and additional clay from the lake bottom. One tree was placed vertically and several trees were piled horizontally with the clay in the breach to make a wall against the water. The bucket of the crane was used to pound the clay into the 35-ft. gap. Approximately 5½ hours were spent effecting the repairs after exiting. When the repairs were finished, the dike completely separated the water of Lake Erie from the standing water on plaintiffs' land.

The rebuilding of the sectioned dike did not return the dike to its previous effective state. A short time after the departure of the contractor, the replaced section began to wash out, allowing water from the lake to reflood the property. The remainder of the east dike, starting at both ends of the repaired sections, gradually began to erode and many of the trees on the dike were lost in the process. At the time of trial very little of the original dike remained.

When plaintiffs discovered the damage to the east dike, they began, amid conflicting advice, to explore possible options for the continued use of the land. They considered trying to fill in the land to raise it, as a permanent solution against repeated flooding. They thought about using the land as an industrial or sanitary landfill, but were unsuccessful in obtaining the requisite permits because of the land's proximity to the village of Estral Beach. Following the discovery of the deteriorated condition of the

east dike, plaintiffs did not themselves attempt any repairs to the dike. The Army Corps of Engineers was not called in to repair the dike, and no subsequent inspections of the dike were made by the Corps after the breach was closed in early May of 1973.

The highest and best use of plaintiffs' land before the flooding was for agricultural purposes. Its value as such remains, assuming the land could be pumped dry and the dike replaced. The existence of the dike, however, is essential to the value of the property as farmland. At present, the property remains submerged, with the waters of Lake Erie directly linked with the water on the property, flowing through and over the remains of the east dike. Plaintiffs have been totally deprived of the use and enjoyment of their property as a direct result of the Government's action in breaching their dike.

*Discussion*

Defendant asserts that if its action caused the failure of the dike at all, plaintiffs' complaint recites conduct which at most constitutes negligence and thus sounds in tort. If defendant's actions sound in tort, then this suit must be dismissed, since 28 U.S.C. § 1491, the Tucker Act, prohibits the Claims Court from deciding such cases. On the other hand, if a taking is found, as a result of Government action, then plaintiffs may recover for the loss suffered. The "essential inquiry is whether the injury to the claimant's property is in the nature of a tortious invasion of his rights or rises to the magnitude of an appropriation of some interest in his property permanently to the use of the Government." *National By-Products, Inc. v. United States,* 186 Ct.Cl. 546, 577, 405 F.2d 1256, 1273–74 (1969).

■ The injury complained of is the flooding of plaintiffs' property and the destruction of their east dike. Courts have long held that a permanent overflow of water caused by Government construction projects and resulting injury to land can be a taking as much as if the land were occupied in other ways. *Id.* at 575, 405 F.2d at 1272–73; *Pumpelly v. Green Bay Co.,* 80 U.S. (13 Wall.) 166, 181, 20 L.Ed. 557 (1871). All that is needed is that the action by the Government involve a direct interference with or disturbance of plaintiffs' rights. *R.J. Widen Co. v. United States,* 174 Ct.Cl. 1020, 1027, 357 F.2d 988, 993 (1966). This is true even though the Government does not actually appropriate title and use the land. *Id.; United States v. Lynah,* 188 U.S. 445, 462, 23 S.Ct. 349, 353, 47 L.Ed. 539 (1903).

■ It is also settled that a taking may be supported where a Government activity or project "which is permanent in nature imposes on private property certain consequences which are themselves permanent, and * * * that their recurrence is inevitable even if only intermittent." *Wilfong v. United States,* 202 Ct.Cl. 616, 622, 480 F.2d 1326, 1329. However, where there is no such showing of inevitable recurrence, but, rather, "a random event induced more by an extraordinary natural phenomenon than by Government interference" there can be no taking, even if there is permanent damage to property partially attributable to Government activity. *Id.; see Columbia Basin Orchard v. United States,* 132 Ct.Cl. 445, 450, 132 F.Supp. 707, 709 (1955).

■ It is clear than that not all flooding resulting from Government activities amounts to a taking. *Sanguinetti v. United States,* 264 U.S. 146, 149, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924). Incidental or consequential injuries to land do not rise to this level and are not compensable under the fifth amendment, although there may be redress in tort. *Hartwig v. United States,* 202 Ct.Cl. 801, 809, 485 F.2d 615, 620 (1973). Negligent flooding is by definition tortious and thus not a taking. However, defendant's characterization of its own actions as tortious in the instant case is conclusory and not determinative of the nature of the invasion at issue.

Courts have found the question of taking to be one which must be decided on the particular facts of each case, *Foster v. United States,* 221 Ct.Cl. 412, 424, 607 F.2d 943, 950 (1979), and that the legal characteriza-

tion of the loss will depend on how direct a product of the actual interference the injury is. *United States v. Causby,* 328 U.S. 256, 265–66, 66 S.Ct. 1062, 1067–68, 90 L.Ed. 1206 (1946). The court will look to the "character of the invasion" in determining the question of compensability. *R.J. Widen Co. v. United States,* 174 Ct.Cl. at 1028, 357 F.2d at 993, citing *United States v. Cress,* 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917).

■ The instant case presents a fact situation which does not precisely fit into the usual pattern of flooding cases. While plaintiffs' land in this case is clearly burdened by permanent flooding, that condition did not result from Government construction activity in the nature of that suggested by the *Pumpelly* line of cases, *i.e.,* a dam or channelling project. Rather, the facts describe a Government activity, collateral to a repair project, which resulted in total interference by flooding with the use of plaintiffs' land. Neither is plaintiffs' flooding the typical tortious injury involving occasional flooding, *see United States v. Cress,* since the destruction of plaintiffs' east dike has resulted in the permanent flooding of their land that persists to this date, and which was solely the result of deliberate conduct by defendant. Finally, the facts do not support defendant's contention that negligence was the cause of the injury. While these circumstances are not common in a flooding case, they are not without precedent and they certainly do not detract from the merits of plaintiffs' claim.

A similar fact situation involving an activity collateral to one of the Corps' engineering activities was found in *Fonalledas v. United States,* 123 Ct.Cl. 483, 107 F.Supp. 1019 (1952). Defendant's contractor was engaged in a dredging operation. The spoil of the dredging was deposited in a designated area adjacent to plaintiffs' land. The contractor had placed sandbags around three sides of the spoil area to contain it, but, as the operation continued, the surface of the spoil area rose above the level of plaintiffs' land. Overflow from the project washed into plaintiffs' land and damaged

part of the acreage with salt water. The court pointed out that "a destruction for public purposes may as well be a taking as would be an appropriation for the same end," *id.* at 502, 107 F.Supp. at 1022, citing *United States v. Welch,* 217 U.S. 333, 339, 30 S.Ct. 527, 54 L.Ed. 787 (1910), and found a taking.

■ The key element which distinguishes a taking from an incidental injury is the presence on the part of the Government of an intent to appropriate. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978). An intent to appropriate may be implied from the facts of the case. *Id.; see PDTC Owners Ass'n. v. Coachella Valley County Water Dist.,* 443 F.Supp. 338, 341 (1978). The facts need only demonstrate that the invasion of property rights was the result of acts the natural and probable consequences of which were to effect such an enduring invasion. *Columbia Basin Orchard v. United States,* 132 Ct.Cl. at 450, 132 F.Supp. at 709. Commenting on *Fonalledas,* the court in *Columbia Basin Orchard* concluded:

> The direct and natural result of leaving this side open with the continued discharge of the spoil on the area caused it to encroach upon plaintiff's property. It was obvious that the continued discharge of it would cause it to encroach upon plaintiff's property and, therefore, the continued discharge of it under these circumstances was a deliberate act of the Government's contractor, which impaired the value of plaintiff's property and constituted a temporary taking. From these facts an intent to take could be implied.

*Id.* at 452, 132 F.Supp. at 711. As in *Fonalledas,* there was no express intent on the part of the Corps to take plaintiffs' land in the instant case; nonetheless, the washout of the dike and flooding of the farm were the natural and probable consequences of defendant's conduct in creating the breach.

In *Pete v. United States,* 209 Ct.Cl. 270, 531 F.2d 1018 (1976), this court found a taking where barges used by plaintiff were rendered useless because the passage of the Wilderness Act barred commercial activities

on the lake where plaintiff conducted a recreational business. Even though the Government did not intend to appropriate the barges, the interference with plaintiffs' exercise of its property rights was seen as a "forseeable consequence of a deliberately conceived governmental program * * *." Such action, the court found, "constitutes a substantial interference with plaintiff's use and enjoyment of the boats, and is, therefore, a taking within the meaning of the Fifth Amendment." *Id.* at 298–99, 531 F.2d at 1035. In flooding cases, intent may be implied where the overflow of water is the "direct, natural or probable result of an authorized activity." *Columbia Basin Orchard v. United States,* 132 Ct.Cl. at 450, 132 F.Supp. at 709. The likelihood of the outcome serves to distinguish conduct which is taking from that which is tortious. In *Causby v. United States,* 109 Ct.Cl. 768, 772, 75 F.Supp. 262, 216 (1948), the court found a taking where the owner was deprived of the use of his property "not by a negligent act, but as the natural consequences of the deliberate, intended exercise of an asserted power."

Courts have found a taking to have occurred even though the defendant has used care in attempting to prevent injury. In *Pashley v. United States,* 140 Ct.Cl. 535, 156 F.Supp. 737 (1957), the Government built a dam and made a concerted effort to seal its base to prevent seepage and flooding onto surrounding land. The court found that "[s]ince the land was in fact taken, whether or not defendant endeavored to prevent this, defendant is liable to pay just compensation, if defendant's act of building the dam was the cause of the taking." *Id.* at 538, 156 F.Supp. at 738. The court noted that "[d]efendant's liability depends not on its want of care, but on the fact of taking as the natural and probable consequences of defendant's acts." *Id.*

Plaintiffs, in the instant case, have not alleged or proved that defendant or its contractor was negligent in repairing the damaged east dike. Although not unanimous, the record does establish that the restoration of the dike was performed in a workmanlike manner. In fact, the contractor who performed the work believed that the dike was stronger as a result of his efforts. Nonetheless, the fact is that almost immediately after the repairs were made, the dike began to erode at the breach point. Common sense suggests that despite defendant's contractor's best efforts, he could not have been expected to restore the clay dike to its prior integrity after an entire 35-ft. center section had been removed in order to provide a means of ingress for the contractor's barge.

Thus, once the dike was compromised, the subsequent erosion at the breach point and the flooding of the land were the natural and probable consequences of defendant's action. This being the case, an intent to take plaintiffs' property can be implied.[1]

1. Defendant also argues that the United States is immune from any liability for damages in this case because of the protection afforded it by 33 U.S.C. § 702c. This section protects the United States from liability for damages caused by floods or flooding under some circumstances, which defendant maintains are present in the instant case. However, that section has been held not to afford immunity "where flooding causing the damage was unrelated to a flood control project." *Sanborn v. United States,* 453 F.Supp. 651, 657 (1977).

While it may be true that the Army Corps of Engineers did have a program for local flood protection of Estral Beach, it can hardly be said that the breach of plaintiffs' dike was a part of that plan. Plaintiffs' dike is not one of the features listed as included in the plan. The extent of plaintiffs' involvement with the village flood control efforts was an easement and right-of-way which gave the village the right to construct, operate and maintain a dike on plaintiffs' property at the north end of the village. This easement and right-of-way did not include access through the east dike. Further, defendant did not appear to consider plaintiffs' east dike part of the project or the dike presumably would have been included in the Corps' dike inspection program as described in the Operation and Maintenance Manual for the Estral Beach flood control area. Defendant's own witnesses testified that there was no inspection of the east dike after it was repaired.

Congress did not legislate blanket immunity when it enacted § 702c for all damage done by floodwaters caused by Government projects. This singular act, made necessary by the emergency in Estral Beach, was not part of a comprehensive flood control project, and thus, in keeping with the rule articulated in *Sanborn,*

Defendant additionally argues that, even if plaintiffs' claim does not sound in tort but, rather, arises under the constitution, the claim must fail because plaintiffs have not shown that its actions were the actual cause of the damage to their property. Defendant's contention is that the dike was weakened and in need of repairs because of natural elements, including the constant battering of the waves from Lake Erie, and that eventually the dike would have given way regardless of the breach. Defendant sets forth four reasons to substantiate this claim.

First, the Government points out that the dike was built of clay over 60 years ago and that up until 1973, a marsh had protected the east dike from the lake's waves. However, the marsh gradually receded and became submerged until none of it was visible above the water. As a result, the unabated force of the waves would now be free to damage the dike. Defendant contends that over time the wave action would further weaken and erode the dike until it collapsed from natural causes.

Second, defendant claims that between 1971 and 1972 vandals dug across the top of the dike and irreparably damaged it. Defendant moreover argues that the trench would have ultimately caused the dike to wash out even without defendant's breach and repairs.

Third, the Government contends that the contractor was diligent in effecting the repairs and that the repairs made the dike at least as strong as it was before the breach.

Finally, defendant points out that during the fall of 1972 and spring of 1973, the Estral Beach area was hit with a series of unusually severe storms. The water levels of Lake Erie were at their highest, and caused widespread flooding. The severity of the storms was such that the area was declared a disaster area on two occasions. Defendant maintains that these factors, combined with the dike's weakened condition, subjected it to such stress that its failure was inevitable.

Defendant's arguments are found to be unpersuasive. The east dike had remained intact for over 60 years. Over this 60-year period the dike had withstood bad weather and flooding on numerous occasions. As the trees on the dike matured and the shrubbery became more dense, their roots became more extensive, solidifying and anchoring the clay as a result of their development.

Although submerged, the marsh remained an inhibiting factor, and functioned to restrict the force and size of the waves hammering on the east dike. As previously pointed out, it took over 60 years for the waters of Lake Erie to encroach upon the marsh and finally cover it. Even so, the fact that it was under water did not immediately eliminate its protective effect. The plants and grass continued to provide resistance to the waves and abated their force, although perhaps not as fully as before.

Plaintiffs' testimony concerning the trench refutes defendant's contentions. Plaintiffs introduced testimony to show that the trench was smaller than described by defendant and that it ultimately plugged itself up with grass and leaves. Although Mr. Reaume, testifying as a witness for defendant, recalled that he repaired the trench with 2 × 12-in. planks and the assistance of some neighborhood children, the record as a whole makes this testimony suspect. Particularly, even though the testimony seems to place the contractor's breach at about the same place on the east dike as the repaired trench, the contractor did not mention coming across the planks or removing them when explaining how he breached the dike. This leads me to conclude that the trench or gully was not significant enough to undermine the strength of the dike.

Defendant also places great emphasis on the fact that only one tree had to be removed in order to excise the 35-ft. section in the dike so the barge could pass onto plaintiffs' farm. In this way, defendant

would not grant the Government immunity under the facts of the present case. In addition, since this case involves a taking, the question of § 702c immunity does not arise.

hoped to convey the rundown, deteriorating condition of the dike. Although the testimony is conflicting, the preponderance of evidence indicates that nowhere along the east dike was there a 35-ft. strip in which there was only one tree standing. Defendant's expert witness in the area of photogrammetry estimated that, at most, the trees across the entire top of the east dike were 6–10 ft. apart. His testimony was based on an aerial photograph taken approximately one month before the breach was made. That photo did not reveal any area on the dike that was not heavily populated with trees. The photograph was taken in March of 1973 when the trees were without leaves and even to the untrained eye the exhibit showed the whole dike densely covered with trees.

Finally, the most persuasive evidence that the deterioration of the dike was due to defendant's actions is the fact that the dike gave way at the very section at which the breach was made. Although limited evidence was presented to show that the dike would have given out anyway, the simple fact is that it had withstood the elements for 60 years. It is more than coincidental that, shortly after the breach and repairs, the dike began to erode outwardly in both directions from the ends of the repaired section. Under these circumstances, it must be concluded that the cause of the dike's failure was its weakened condition as a result of defendant's breach and subsequent repairs.

My conclusion comports with the requirement of causation set out in *Sanguinetti v. United States,* 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608 (1924), that, in order to create an enforceable flooding liability against the Government, the overflow must be the direct result of the Government's activity. *Id.* at 149–50, 44 S.Ct. at 265. Here, I find that the dike would not have failed if the defendant had not ordered an entire 35-ft. section of it to be removed.

Both at trial and in its posttrial briefs, defendant stressed that plaintiffs had failed to immediately notify the Army Corps of Engineers of the failure of the repairs. If this lack of action on plaintiffs' part was the reason the dike was destroyed and the land permanently flooded, defendant would have a compelling argument. This court has held that where there is no such notice, the Government cannot be held liable for the injury to the extent it would have been able to mitigate the damage. *Wilfong v. United States,* 202 Ct.Cl. at 624, 480 F.2d at 1330.

In *Wilfong,* plaintiff complained that Air Force overflights resulted in injury to his commercial egg and poultry business. The court based its decision that there was no taking in part on the fact that the plaintiff failed to complain of the nuisance and thus give the Air Force an opportunity to abate it by removing its cause. No recovery could be had without such an opportunity where the trespass would have been "terminable conveniently, quickly and at will." Under the facts of *Wilfong,* the court noted that while there may have been some damage from overflights, it would have been "consequential in nature and tortious in origin rather than a compensable taking under the Fifth Amendment." *Id.* at 624, 480 F.2d at 1330.

The instant case differs from *Wilfong* in several significant respects. In the first place, the Government was not unaware of the cause of the problem. It knew full well that it had removed a 35-ft. section from the dike and that repairs to a clay dike are problematic at best. I do not believe, given the circumstances of this case, that the plaintiffs are chargeable with the type of inaction that the *Wilfong* case sought to discourage. In addition, the Government cannot raise this argument to totally absolve itself of the responsibility it had to inspect plaintiffs' dike after the repair work was done. Indeed, a reading of the Army Corps of Engineers' "Operation and Maintenance Manual for Local Flood Protection at Estral Beach, Lake Erie, Michigan" underscores the care and vigilence that are necessary with earthen dikes. This is significant because it clearly establishes the necessity of the Corps to closely monitor the repairs made to plaintiff's east dike under the un-

precedented flooding conditions which existed in the spring of 1973.

In addition, if defendant argues that plaintiffs were obligated to mitigate damages by notifying defendant as quickly as possible of the failure of its repairs, the record is totally devoid of when the failure occurred and when plaintiffs first knew of the failure. The best that can be gleaned from the record is that the repairs which the contractor had made to the east dike failed almost immediately after the contractor's May 7 departure. This was probably the worst time from a detection point of view, for being early spring and with the flooded condition that existed, farming of the land was probably the last thing on plaintiffs' mind. Moreover, since the farm was not inhabited and the flooding undoubtedly discouraged any weekend visitation by the plaintiffs, it seems highly likely that plaintiffs were totally unaware of the destruction of the repairs to the dike.

Defendant has, in addition, not established what the state of the dike was at the time that plaintiffs learned of the failure. It may be that when plaintiffs first learned of the failure that the dike had deteriorated to the point where additional repairs were no longer practicable.

As can be seen from the above analysis, defendant's argument that it is not liable for damages because of the failure of plaintiffs to timely notify defendant of the dike's collapse, is an invitation to indulge in rank speculation. This I will not do.

This case also differs from *Wilfong* because defendant has not shown that the dike could have been repaired if defendant had received timely notice. It appears doubtful that the Corps would have been able to do any more than it had already done. In the first place, the contractor testified that he had repaired the dike to a state that made the dike as strong or stronger than it was before the break. Notwithstanding, the dike immediately failed at the point of the contractor's repairs. There is nothing in the record that shows that defendant would have been able to improve on these repairs or that any

subsequent repairs would not have been equally ineffective.

The testimony at trial indicates, even though no one observed when or how, that the failure of the east dike began with the deterioration of the repairs made to the 35-ft. section. It appears that the wave and water action eroded the newly tamped earth fill and began the expected destructive process. Thus, the lack of notice to defendant is not fatal at this instance, since it appears that there would have been no effective way, short of rebuilding the dam at an excessively high cost, of repairing an earthen dam which had had an entire 35-ft. section removed from its center.

■ Finally, for an appropriation by the Government to be compensable under the fifth amendment, the taking must be for a public purpose. The eminent domain power permits the Government to operate efficiently in situations where the very legal rights, such as property rights, which the Government upholds for its individual citizens would defeat the ability of the Government to act for the greater welfare of the total citizenry. Individual property rights give way to the right of the Government to take what it needs to fulfill its responsibilities to the total populace with the understanding that the individual will be compensated for this deprivation. Moreover, the Government must be able to act in timely fashion. In this regard it must sometimes act in derogation of the procedural regulations which it has promulgated to govern itself, whenever these procedures cost more in time and money than is available.

The facts of this case show that the action taken by the Corps in breaching plaintiffs' dike was done for a public purpose. The village of Estral Beach was threatened with the complete failure of their north dike. If this happened, it was feared that extensive property damage to the village would occur. The only feasible way to effect the needed repairs was by bringing in equipment via barge, over and through plaintiffs' dike. The Army Corps of Engineers and the citizens of the village sought plaintiffs' permission to breach their dike

while threatening to obtain a court order if permission was not granted. There is no question that the invasion of plaintiffs' property was done for the benefit of the village of Estral Beach and thus constitutes an appropriation for public use as contemplated by the fifth amendment, and is compensable.

Having concluded that the elements of a taking have been satisfied, I find that the permanent flooding of plaintiffs' land as a result of defendant's breach of the east dike constitutes a taking under the fifth amendment and that the plaintiffs may recover for their loss.

### Damages

The final matter to be resolved in this case is the amount of just compensation to be awarded for the taking. Plaintiffs argue that defendant's expert, Mr. Treadwell, using market values, appraised the land at $1500 per tillable acre, assuming a viable dike. The figure also assumes that the land is put to its highest and best use, which is agriculture. The amount of tillable acreage, according to Mr. Treadwell, was 152.6 acres, making the total value of the land $228,900. Plaintiffs also maintain that they are entitled to interest on the award from the time of taking to the satisfaction of the judgment. The date of taking is the date of the breach of the dike, or April 3, 1973. The interest, they believe, should be the rate allowable under state law, if reasonable. In Michigan, this would permit interest at the rate of six percent simple interest on the award from April 3, 1973, through May 31, 1980, and 12 percent compounded annually on the amount accrued as of May 31, 1980, until satisfaction of the judgment.

Defendant would also look to the testimony of Mr. Treadwell as the only competent evidence of record as to value. The defendant maintains that Mr. Treadwell's testimony shows that there was not change in per acre value after the alleged taking and that plaintiffs are thus unable to show any damage to their property. However, as plaintiffs point out, the Treadwell estimate assumes a dike in need of repair, both before

and after the taking for his low estimate and a viable dike for his high estimate. As previously discussed, the dike before the taking has been found to have been viable. It has also been determined that the dike was destroyed after the breach and, as a result, the property rendered useless. Therefore, the defendant's contention that plaintiffs have shown no injury cannot stand.

■ It is clear that the market value of the property at the time of the taking is the measure to be used in arriving at just compensation. *United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 279–80, 87 L.Ed. 336 (1942). The market value is usually considered to be what a willing buyer would pay in cash to a willing seller. *Id.* Plaintiffs would have the court award $1,500 per tillable acre for each of 152.6 acres or $228,900, the estimate placed on plaintiffs' land by defendant's expert. However, as the parties acknowledge, the award must also be just with regard to the public, and plaintiffs' suggestion does not comport with this requirement. As the court pointed out in *Miller,* "[w]here the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons." *Id.* at 375, 63 S.Ct. at 280.

■ We are not confronted in the instant case with the need to estimate the market value of plaintiffs' property. Plaintiffs Berenholz and the Millers agreed to pay plaintiffs Fred and Leoda Strong $155,000 for the property in September of 1972. Since the time of their purchase to the time of the taking no improvements or changes had been made to the property. In fact the property was never used over the winter months and the taking occurred before plaintiffs would have begun spring planting in 1973. To award plaintiffs, who represent both the buyers and sellers of the property, the amount of $228,900 would be to provide them with a windfall, that is, $73,900 beyond what they all agreed was the value of the land only seven months before the taking in an arm's-length transaction. This, I

find, is not only beyond what is required to make the plaintiffs whole, but would also unjustifiably enrich them at public expense. I therefore conclude that the amount of $155,000 actually paid for the farm, just months before the taking by defendant, was negotiated sufficiently contemporaneous with the taking to represent a better and more just valuation of the property than the estimate of the expert witness.

In addition to the value of the property taken, plaintiffs are entitled to interest on that amount. In deciding the rate of interest, I look to prior decisions of this court which have evaluated the issue of delay of payment at great length. In *Miller v. United States,* 223 Ct.Cl. 352, 401–06, 620 F.2d 812, 838–41 (1980), another taking case, the court adopted the interest rates computed as appropriate for the years 1971–75 by *Pitcairn v. United States,* 212 Ct.Cl. 168, 189–97, 547 F.2d 1106, 1120–24 (1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978), and *Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 273–75, 552 F.2d 343, 352–53 (1977), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). This rate was found to be 7½ percent for those years. Using the same approach, the *Miller* court found that a rate of 8½ percent was proper for the years 1976–79. Finally, a rate of 12 percent was used for the year 1980 to the date of payment, but the *Miller* court held that this rate was not binding as precedent.

These same rates were adopted in *Georgia-Pacific Corp. v. United States,* 226 Ct.Cl. 95, 157, 640 F.2d 328, 367 (1980). Although in that case the rate of interest for the period from January 1, 1980, to the date of payment was left to be determined by the trial judge on remand, the parties stipulated to an interest rate of 12 percent. A rate of 12 percent was also used in *Zunamon v. United States,* 227 Ct.Cl. 605, (1981). The interest requested by plaintiffs and allowed by the State of Michigan is 12 percent beginning in May of 1980 and compounded annually to the date of payment. In the instant case, I believe that simple interest at the rate of 12 percent per annum from January 1, 1980, until the date of satisfaction of the judgment is reasonable. As the court noted in *Miller,* "[t]his court is bound both by our prior decisions and the above-mentioned policy favoring uniform treatment of condemnees with respect to the amount of just compensation for delay of payment." 223 Ct.Cl. at 404, 620 F.2d at 840.

### CONCLUSION

Accordingly, upon the foregoing findings of fact, I conclude as a matter of law that the permanent flooding of plaintiffs' land constituted a taking under the fifth amendment and plaintiffs are entitled to a payment of $155,000. Simple interest on that amount will be allowed at the rate of 7½ percent per annum from April 3, 1973 to December 31, 1975, at the rate of 8½ percent per annum from January 1, 1976, to December 31, 1979, and at the rate of 12 percent per annum from January 1, 1980, to the date of payment.

Payment of the amount awarded is contingent upon tender of a deed to the property taken in this case in such form as will ensure the United States has fee simple title to the land.