George H. PASHLEY and Selma T. Pashley

v.

**The UNITED STATES.**

No. 125–55.

United States Court of Claims.

Dec. 4, 1957.

Mont Clair Spear, Seattle, Wash., for plaintiffs. Lewie Williams, Seattle, Wash., was on the briefs.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

WHITAKER, Judge.

Plaintiffs sue for just compensation, alleging that their property has been flooded and that its value for the mining of sodium sulphate has been destroyed as a result of the construction of the O'Sullivan Dam on Lower Crab Creek in the State of Washington. Defendant defends on the ground that the flooding was not the natural and necessary consequence of the construction of the dam, and on the ground that plaintiffs have no title to the minerals on the property.

The land in question is situated in the Columbia Basin in central Washington.

This vast area, comprising some two million acres, is now being partially irrigated by the Columbia Basin Project of the Bureau of Reclamation. The Grand Coulee Dam on the Columbia River is the principal structure in a complex of dams, reservoirs and canals designed to carry water to the irrigable portions of the basin. The function of O'Sullivan Dam, a part of the aforementioned project is to impound waters in the Potholes Reservoir. The site of the Reservoir was a natural depression into which surface waters of the basin drained before flowing into the Columbia River through Lower Crab Creek. O'Sullivan Dam was built at the lower end to hold the waters in the reservoir.

The site for the dam was selected after exhaustive geological investigation. Every effort was made to make the base of the dam watertight so as to prevent leakage or seepage on the downstream side. A mixture of cement and water was pumped into holes drilled from 35 to 110 feet deep into the bedrock forming the base of the dam, to seal off any cracks, fissures, or interflow areas which might be contained in the deep basalt rock formations. The dam itself is earthfilled, but there is no claim that it was improperly designed or constructed. Nevertheless, it is a fact that plaintiffs' land was flooded after the dam was constructed and the waters impounded, as more fully stated hereinafter.

Plaintiffs' land is located approximately one mile below the dam, and approximately one and three quarters miles west of Crab Creek. It is situated within one of the many coulees or gorges of the Drumheller Channels, which were cut out centuries ago by glacial waters. During prehistoric times there were flows of tremendous volumes of glacial water and ice over the Columbia Basin which gouged out huge channels and in some places left huge, undrained depressions. The Drumheller Channels were formed in this manner and one of the undrained depressions was called Sulphate Lake, sometimes erroneously referred to as Sodium or Soda Lake. A larger area, which includes Sulphate Lake, is now called Corral Lake. Because of deposits of sodium sulphate contained therein, plaintiffs' property bears the name "Sulphate Lake."

For many years prior to the inundation herein complained of, this land was completely dry during the summer months, although it accumulated from one to two feet of water during the remainder of the year. Thus it was possible to enter upon the property, and to mine the sodium sulphate deposits during the periods in each year when the lake bed was dry, but plaintiffs have never regularly conducted mining operations.

■ 1. We think the proof shows that the flooding of plaintiffs' property was caused by the erection of the dam.

Defendant knew that the impounding of the waters above the dam would probably cause the property below the dam to be inundated. This is evidenced by the fact that it went to great pains to prevent the water from seeping through it. But, whatever precautions were taken, the land was flooded nevertheless. Since the land was in fact taken, whether or not defendant endeavored to prevent this, defendant is liable to pay just compensation, if defendant's act of building the dam was the cause of the taking. Defendant's liability depends not on its want of care, but on the fact of taking as the natural consequence of defendant's acts.

As far back as 1906, at least from 1916 until the time the dam was built, Sulphate Lake was covered with only one to two feet of water during the winter months, which would dry up about June of each year until rains commenced in the fall. O'Sullivan Dam commenced to impound water in 1949; by 1952, after the reservoir had filled and created a head of pressure against the dam, the plaintiffs' property was inundated to a depth of 10 feet; by June 4, 1955 it had become flooded to a depth of 42 feet.

The evidence shows that part of these flood waters, at least, came from new springs or streams which broke through

the ground between the dam and plaintiffs' property, presumably caused by the pressure of the waters above the dam on underground waters, or caused by the escape of the impounded waters through crevices and underground channels. The floor of the reservoir behind the dam, just north of it, ranges from 980 to 1,020 feet, whereas the floor of Sulphate Lake is 892 feet, or nearly 100 feet lower than the lowest elevation of the floor of the reservoir. Any water that might have escaped from the reservoir naturally drained into Sulphate Lake.

There is testimony to the effect that the water table has been raised as a result of the entire Columbia River Project, but this would not absolve defendant, nor is this sufficient to account for a depth of 42 feet of water on plaintiffs' property.

We think the facts herein clearly indicate that the flood waters now on plaintiffs' land are the result of the impounding of great quantities of water behind O'Sullivan Dam that have found their way either under or through the dam and onto plaintiffs' property. Cf. Cotton Land Co. v. United States, 75 F.Supp. 232, 109 Ct.Cl. 816; United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277, affirming 74 F.Supp. 653, 109 Ct.Cl. 555.

2. Plaintiffs' suit is based upon the destruction of the value of the mineral deposits on their property. Defendant says plaintiffs by their tax deed acquired no title to the mineral deposits on the land, and, therefore, are not entitled to damages for the destruction of them.

Plaintiffs obtained title to the lands that were flooded under a tax deed. The property was put up for sale by the State of Washington to satisfy its claim for unpaid taxes. It was bought in by plaintiffs on November 3, 1943 for the sum of $6.45. This was paid for the entire property. Under it plaintiffs acquired all interests in the land, surface and sub-surface, including mineral rights, as appears from the following:

Prior to 1921 there had been no effort by the owners to separate the mineral rights in the property from other rights in it, but in 1921 Drumheller, the owner of the entire fee, purported to convey the mineral rights therein to one Donaldson. Three years later Donaldson transferred his rights in the property to a company of which he was president, the Basic Resources Company. After another three years, this company transferred, not only the mineral rights, but the entire fee to another company, of which Donaldson was president, the International Chemical Company. This company subsequently conveyed the entire fee to the property to Donaldson individually. Donaldson thereafter transferred an undivided one-half interest in the entire fee by separate deeds to J. D. Hull and A. M. MacDonald, who, on the tax assessor's books, were the owners at the time the property was sold for taxes.

From the foregoing, it appears that Hull and MacDonald acquired the right to mine the minerals on the property. Although the deed to them was a deed not only of the mineral interests but also of the fee, there is some doubt that they thereby acquired title to the property in fee simple. However, they and their predecessors in title had held the property under color of title probably long enough to have acquired title by adverse possession. But, be this as it may, the property was assessed on the tax assessor's books as an entirety; the mineral interests were not assessed separately. The proceedings to enforce the tax lien were proceedings to foreclose all rights in the property and to vest the property in fee simple in the purchaser at the tax sale. The tax deed to plaintiffs was a deed to the property in fee simple, and the purchaser thereunder, in our opinion, acquired title to the property in fee simple, because the lien of the State of Washington for taxes was a lien on the entire fee and was superior to the rights of all other persons claiming an interest therein.

But, in any event, at the time of the tax sale, Hull and MacDonald, who were

the record owners of the property on the books of the tax assessor, did then own the right to extract minerals from the property. The purchaser at the tax sale, therefore, at least acquired the right to extract the minerals therefrom. It is for the destruction of this interest that plaintiffs sue.

■ It would seem, therefore, that plaintiffs have the capacity to maintain this suit, whether or not defendant may be correct in saying that the mineral interests should have been assessed separately.

■ 3. The next question is the value of the property taken.

As stated, plaintiffs acquired the property for $6.45.

From 1896 to the date of the trial of this case there has been no sale of minerals extracted from this property, except for some inconsequential "spot" sales.

There were extensive sulphate deposits on the land, although it is doubtful whether it was sufficiently pure for commercial use. But, whatever the amount of the deposit, it could be mined, before the flooding, only for a few months during the summer. Thus the owner was unable to furnish sulphate continuously throughout the year, and a constant source of supply is essential to the users of sodium sulphate. On the other hand, there are a number of sources in this general region that have an unlimited supply of this product. This makes it very doubtful that plaintiffs could have found a market for their product even if they could have mined it. At any rate, neither Donaldson from the time he first acquired an interest in the property in 1916, nor his successors in title have ever found a market.

The value of plaintiffs' interest was inconsiderable. The Commissioner of this court has found a value of $2,500. This seems to us just, both to plaintiffs and defendant. Judgment for this amount will be rendered together with interest at four (4) percent per annum as a part of just compensation from December 5, 1952 until date of payment.

It is so ordered.

JONES, Chief Judge, MADDEN and LITTLETON, Judges, and FAHY, Circuit Judge, sitting by designation, concur.