Donald MODEN and Barbara Moden, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–294 L.

United States Court of Federal Claims.

April 9, 2004.

---

Steven C. Beardsley and Ted L. McBride, Rapid City, South Dakota, for the plaintiffs.

Willaim J. Shapiro, Washington, D.C., with Thomas L. Sansonetti, Assistant Attorney General, Environmental and Natural Resources Division, United States Department of Justice, for the defendant. Tim Evans, Trial Attorney, United States Air Force, Arlington, Virginia, of counsel.

## OPINION

BUSH, Judge.

This takings case is currently before the court on defendant's Revised Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment, and Memorandum of Law in Support Thereof and Exhibits Thereto. For the reasons set forth herein, defendant's Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment is hereby granted for lack of subject matter jurisdiction. Because the court dismisses plaintiffs' action for jurisdictional reasons, the court finds it unnecessary to address defendant's motion for summary judgment.

## BACKGROUND

### I. Factual Background

The following facts are undisputed unless otherwise noted. Ellsworth Air Force Base (Base) is located twelve miles east of Rapid City, South Dakota, and is adjacent to the small community of Box Elder. The Base covers approximately 4,858 acres and includes runways, airfield operations, industrial areas, housing, and recreational facilities. The Base was activated in July 1942 and has served as a support, training, maintenance, and testing facility since that date. In its early years, the Base served mainly as a training facility for B–17 bomber crews. Presently, the Base hosts the 28th Bombardment Wing.

Open land, with a few individual residences, lies to the north, south and west of the Base, while residential and commercial areas lie to the east. Plaintiffs, Donald and Barbara Moden, own 719 acres of real property in Pennington County, South Dakota, located approximately five (5) miles east of the Base boundary (Subject Property). Plaintiffs allege that the Subject Property has been contaminated with trichloroethylene (TCE), a possible carcinogen. Plaintiffs allege that this contamination originates from activities on the Base.

As early as 1983, the United States Air Force (Air Force) began environmental assessments of its military bases through the Department of Defense Installation Restoration Program (IRP). The IRP was initiated at the Base in 1985 and was conducted in phases. At the end of the first phase, seventeen (17) locations on the Base were identified as possible locations of the release of hazardous substances. The second phase of the IRP revealed the existence of various contaminants on the boundaries of the Base. As a result of the IRP studies, the Base was listed on the United States Environmental Protection Agency's (EPA) National Priori-

ties List (NPL) on August 30, 1990. As a consequence of being listed on the NPL, the Base became subject to the provisions of Section 120 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), which required that the Base "commence a remedial investigation and feasibility study" of the facility within six months of listing. 42 U.S.C. § 9620(e)(1).

Consequently, in January of 1992, a Federal Facility Agreement (FFA) was signed by the EPA, the Air Force and the State of South Dakota, with an effective date of April 1, 1992. The FFA established a framework and schedule for developing, implementing, and monitoring appropriate response actions for the Base in accordance with the provisions of CERCLA. The FFA also set out the oversight procedures for the EPA and South Dakota to ensure Air Force compliance with the specific requirements. The FFA identified discrete areas, termed "Operable Units" (OUs), to better study and remedy the problems that had been identified on the Base.

During the course of its study and cleanup of the Base, the Air Force became concerned that the groundwater on neighboring off-base properties may have become contaminated. Consequently, in 1992, the Air Force began providing residents whose property was south of the Base with an alternate water supply after the Air Force discovered possible contaminants, including TCE, in those residents' drinking water.

Still concerned with on-base contamination and to further identify the extent of any off-base groundwater contamination, the Air Force authorized a series of extensive investigations to study groundwater conditions on and around the Base between 1993 and 1996. These tests were conducted by the environmental consulting company EA Engineering, Science and Technology (EA Engineering). EA Engineering entered into a contract with the Army Corps of Engineers (the Corps) to prepare feasibility studies for the initial evaluation of what potential remedial actions could be taken at Base sites and to then prepare records of decision once those remediation methods were selected.

In March 1996, EA Engineering completed the feasibility studies and a final remedial investigation report for one of the operable units, OU–11, which revealed the existence of certain organic contaminants in the on-base groundwater, the most common of which was TCE. However, EA Engineering was unable to identify the source of the contamination. The report recommended attempting to contain the TCE contamination, while further evaluating the best course of action for remediation. EA Engineering's contract with the Corps ended in 1996, and at that point, Rust Environment and Infrastructure (Rust E & I) another consulting firm, was hired by the Corps to design and construct future remedial action.[1]

An April 1998 report prepared by EA Engineering and RD Todd & Associates[2] revealed that the TCE contamination had moved off-base towards the east/southeast approximately 4.5 miles from the Base. A July 1998 report concluded that the source of the off-base contamination appeared to be centralized at two locations on the Base: (1) a well designated as MW93BG04 (BG04) lo-

---

1. CERCLA imposes liability for costs on four categories of "persons" in regard to cleaning up hazardous wastes: (1) current owners or operators of a facility; (2) owners or operators at the time of disposal; (3) persons who arranged for disposal or treatment, or for transportation for disposal or treatment; and (4) transporters. 42 U.S.C. § 9607(a). The United States fits within CERCLA's definition of a "person." *Id.* § 9601(21). In fact, CERCLA specifically provides that each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, CERCLA in the same manner and to the same extent, both procedurally and substantive-

ly, as any non-governmental entity. *Id.* § 9620(a). Because CERCLA is a remedial, rather than a fault-based statute, a person, including the government, may be held fully liable for clean-up costs based solely on their status as a potentially responsible party, even if the person neither caused nor contributed to the release of hazardous substances at the site. *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 (2d Cir.1985).

2. RD Todd & Associates was hired as a subcontractor of Rust E & I study potential contamination sources for the TCE plume migrating east off of the Base.

cated in an open area at the northeast edge of the Base, and (2) a well designated as MW93BG05 (BG05) located near a housing area in the east-central portion of the Base. According to the report, groundwater contamination from the two areas appeared to have commingled approximately one-half mile east of the Base and migrated in an easterly direction now 5.5 miles away, reaching the Subject Property. Studies indicated that the contamination eventually would naturally attenuate, but the Air Force engaged in an extensive cleanup program, costing approximately $61,358,000, in order to avoid further migration of chemical contaminants to on-base and off-base groundwater. Included in these costs were $1,800,000 to provide landowners east of the Base with clean, potable water.

A final five-year review was published on September 19, 2000, which indicated that the Air Force's remediation plan was working well. However, the Air Force and various experts employed by the government were still unable to identify with certainty the source of the contamination. The theory propounded by both plaintiffs and the defendant is that if the TCE contamination at issue originated on-base, it is possible that it was a result of routine aircraft maintenance activities that took place on the Base in the 1940s and 1950s. Specifically, according to some reports, the contamination may have been caused by activities in or around the Base's Pride Hanger or Building 8115.

Pride Hanger was constructed around 1942 as an aircraft maintenance and storage facility for B–37 bombers. For several years, Pride Hanger was used as a location to perform routine aircraft maintenance operations, including aircraft cleaning. Pride Hanger had a large underground storage tank that was used to store TCE for use in the hanger. Def.'s Ex. 12 ¶ 19. TCE was used in Pride Hanger as a degreaser for engine parts. *Id.* ¶ 18. To wash a plane, one part of the selected cleaner was mixed with nine parts oil and applied to the plane. *Id.* ¶ 19. After some time, the plane was washed with pressurized water emulsifying the oil. *Id.* The emulsified material went into an underground collection and drainage system, and

then to an industrial water treatment plant. *Id.;* Def.'s Ex. 10 ¶ 36. Pride Hanger has not been used as an aircraft maintenance facility since the early 1960s. The shops at or near Building 8115 may have also used small quantities of degreasers, possibly including TCE, for equipment maintenance activities.

The parties agree that storage and use practices on the Base met or exceeded the requirements for use and storage of chemicals mandated by state and federal programs. At the time of use of these chemicals at Pride Hanger and Building 8115, during the 1940s and 1950s, TCE and its effects probably were unknown. Thus, it was likely that no one at the Base knew about TCE. Although Pride Hanger and Building 8115 are the most probable sources of the contamination, no one has been able to pinpoint either of them as being such with certainty. The parties also agree that there is no evidence that the migration of the contaminants under the Subject Property was the result of any intentional or even accidental dumping by the defendant.

The primary dispute between the parties, as set forth in their respective arguments, is whether the migration of TCE and other contaminants toward the Subject Property was a natural consequence of the government's use of degreasers at the Base. Defendant alleges that the contaminants migrated to the Subject Property through unusual, previously undetected underground channels called "paleochannels," and that the direction of the migration of the contaminants was unnatural and unforeseeable. Defendant contends that this is the case because the topography of the area indicates that the Base lies on a relatively flat area and slopes southward, thus causing surface water drainage to also flow southward towards Box Elder Creek, not east towards the Subject Property. Accordingly, defendant contends that because plaintiffs' property lies east of the Base, and not south, it was unforeseeable that any contamination from the Base would have migrated in an easterly direction, and instead would have been expected to have migrated south in the direction of normal surface water drainage.

Plaintiffs, on the other hand, contend that paleochannels, or channel deposits, in western South Dakota have been documented for a considerable period of time and that there was nothing unnatural or unusual about the contamination having migrated easterly to the Modens' property via these groundwater channels. Plaintiffs contend that terraced deposits on the site on which the Base is located slope to the east-southeast, and therefore, any groundwater would be expected to orient towards the east-southeast, as well. Accordingly, plaintiffs argue that it would be natural and probable that the contamination plume would also move in an east-southeast direction, inevitably reaching plaintiffs' property, since the groundwater contours follow the regional bedrock slope towards the east-southeast.

## II. Procedural History

Plaintiffs initiated suit in this court on May 15, 2001, alleging that they are entitled to compensation under the Fifth Amendment of the United States Constitution for the inverse condemnation of their property. Plaintiffs specifically allege that a TCE contamination plume originating from the Base resulted in a permanent and substantial interference with the use and enjoyment of their property, amounting to a compensable taking. Defendant filed its answer on July 12, 2001. On January 14, 2002, defendant filed its Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment and Memorandum in Support Thereof, Exhibits thereto, and Defendant's Proposed Findings of Uncontroverted Fact.

Subsequent to additional discovery permitted by the court, on December 20, 2002, defendant filed a Revised Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment and Memorandum in Support Thereof, Exhibits thereto, and Defendant's Proposed Findings of Uncontroverted Fact. On January 24, 2003, plaintiffs filed a Memorandum in Response to Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment, Exhibits thereto, and a Response to Defendant's Proposed Findings of Uncontroverted Fact. On February 4, 2003, defendant filed its Reply Brief in Support of its Revised Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment.

## DISCUSSION

### I. Standard of Review

Defendant moves this court to dismiss plaintiffs' claims under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) for lack of subject matter jurisdiction. In essence, defendant argues that the court lacks jurisdiction to entertain this case because the alleged wrongful actions on the part of the government constitute a tort and not a taking. This court's authority is founded upon the Tucker Act, 28 U.S.C. § 1491(a). The Tucker Act confers jurisdiction over money claims against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* § 1491(a)(1). Accordingly, while this court is authorized to exercise jurisdiction over takings claims under the Constitution, this court does not have jurisdiction over claims that sound in tort. *See Brown v. United States*, 105 F.3d 621, 623 (Fed.Cir. 1997); *Morris v. United States*, 33 Fed.Cl. 733, 740 (1995); *Poorbaugh v. United States*, 27 Fed.Cl. 628, 631 (1993). The fact that plaintiffs do not label their claim as one sounding in tort is irrelevant. *Id.; Adams v. United States*, 20 Cl.Ct. 132, 135 (1990) (citation omitted).

The court should construe the allegations in the complaint in a light most favorable to the pleader with respect to a motion to dismiss for lack of subject matter jurisdiction. *See Martinez v. United States*, 48 Fed.Cl. 851, 856 (2001) (*citing Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)), *aff'd in part*, 281 F.3d 1376 (Fed. Cir.2002). The plaintiff bears the burden of establishing subject matter jurisdiction and must do so by a preponderance of the evidence. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998)

(*citing McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936)); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). If a defendant mounts a factual challenge to the facts upon which jurisdiction is premised, the plaintiff may lose the benefit of the foregoing presumption of truth. *McNutt*, 298 U.S. at 189, 56 S.Ct. at 785. The court may then look beyond the pleadings to consider all available evidence, in the instant case the parties' filings, in order to determine jurisdiction. *Martinez*, 48 Fed.Cl. at 857 (*citing Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir. 1991)). Similarly, if the court has doubts regarding jurisdiction, it may look at all the evidence presented to satisfy itself regarding the jurisdictional facts. *See RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461–62 (Fed.Cir.1998). As stated in *Martinez*, "[i]ndeed, the court may, and often must, find facts on its own." 48 Fed.Cl. at 857.

Defendant's motion to dismiss for lack of subject matter jurisdiction, though submitted after the filing of defendant's answer, is timely in this case because such a defense is not waived. *See Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.1993). Therefore, mindful of plaintiffs' burden to establish jurisdiction, as well as the court's duty to ensure its ability to entertain jurisdiction, the court considers all of the evidence presented for this court's consideration in evaluating the government's motion to dismiss, even evidentiary matters outside of the pleadings. *See Indium Corp. of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 884 (Fed.Cir.1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); *Reynolds*, 846 F.2d at 748.

**II.  Analysis**

■  Plaintiffs describe this action as "an inverse condemnation action arising out of an unconstitutional taking of real property by the United States without formal condemnation or the payment of just compensation." Comp. ¶ 5. Fifth Amendment takings cases are referred to as actions for "inverse condemnation" when a municipality condemns a property, but fails to conduct an eminent domain proceeding before the taking of the property. *See Agins v. City of Tiburon*, 447 U.S. 255, 258, n. 2, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) ("Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'") (*citing United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980)); *see also* Kim C. Pflueger, *Takings Law—Is Inverse Condemnation an Appropriate Remedy for Due Process Violations?*, 57 Wash. L.Rev. 551, 572 (1982) (stating that a property owner is entitled to institute a suit for inverse condemnation to compel an ex post facto recovery of just compensation) (*citing* Van Alstyne, *Taking Or Damaging By Police Power: The Search For Inverse Condemnation Criteria*, 44 S. Cal. L.Rev. 1 (1970); *Note, Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance*, 26 Stan. L.Rev. 1439 (1974)). The Modens aver that this takings case should be construed as an action for inverse condemnation. Neither party in this action alleges that any formal condemnation proceeding in this matter has been instituted.

In view of the fact that the parties have aptly identified this matter as an inverse condemnation action, this court must address the threshold question as to whether there is subject matter jurisdiction to entertain this case. The court entertains the jurisdictional question first, since jurisdiction is a prerequisite which must be met prior to any substantive issues presented by summary judgment. *See Lockheed Martin Corp. v. United States*, 50 Fed.Cl. 550, 553 (2001), *aff'd*, 48 Fed. Appx. 752 (Fed.Cir.2002). Defendant moves this court, pursuant to RCFC 12(b)(1), to dismiss plaintiffs' claim for lack of subject matter jurisdiction. In particular, defendant argues that plaintiffs' claim does not meet the requirements for asserting a compensable taking under the Fifth Amendment. Instead, defendant argues, plaintiffs' claim is merely one of tort over which this court lacks

subject matter jurisdiction. *See* 28 U.S.C. § 1491(a)(1).

Whether plaintiffs' claim sounds in tort or constitutes a compensable taking under the Fifth Amendment depends upon the nature of the government's invasion, and whether the injury to plaintiffs' property is in the nature of a tortious invasion of plaintiffs' rights, or rather, rises to the magnitude of an appropriation of some interest in plaintiffs' property. *See Bettini v. United States*, 4 Cl.Ct. 755, 758 (1984) (*citing National By-Products, Inc. v. United States*, 186 Ct.Cl. 546, 405 F.2d 1256, 1273–74 (1969)). If the interference, even if temporary, with plaintiffs' property rights is substantial enough, it may rise to the level of a taking. *See Eyherabide v. United States*, 170 Ct.Cl. 598, 345 F.2d 565, 569 (1965); *see also Poorbaugh v. United States*, 27 Fed.Cl. 628, 632 (1993) ("[i]t is not essential for the government to have actually taken physical possession of the property; a taking can occur simply when the government by its actions deprives the owner of all or most of his or her interest in the property"(citation omitted)).

The parties do not contest that the government's alleged action in this matter, *i.e.*, the use of TCE as contained in chemical degreasers on the Base, was authorized, a jurisdictional requisite to bring a takings claim in this court. *See Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 819 (1978); *see also Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed.Cir.1993) (citations omitted). It is also undisputed that plaintiffs have a property interest in their land, in this case ownership of the property at issue, which is also a requirement for asserting an action for a compensable taking under the Fifth Amendment. *See, e.g., Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed.Cir.2001), *cert. denied*, 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002). Consequently, the issue to be determined herein is whether the government's conduct constitutes a claim for a taking or, rather, have plaintiffs merely asserted a cause of action that sounds in tort.

Much of the case law discussing the difference between a tort and a taking with respect to inverse condemnation cases is set forth in the context of government-induced floodings. This is evidenced in the case law cited in the parties' submissions to the court.[3] *See, e.g., United States v. W.R. Cress*, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917) (affirming lower court ruling that erection of a lock and dam to "canalize" a river required the government to compensate private landowner for frequent overflows); *City of Van Buren v. United States*, 697 F.2d 1058 (Fed.Cir.1983) (affirming trial court's finding of a compensable taking where government's action of closing a lock and dam raised groundwater levels to the point that such water flowed into plaintiff's sewage system pipelines, causing damage to the pipelines since the proximate cause of the damage was the government's action and not the poor design of the sewage system); *Barnes v. United States*, 210 Ct.Cl. 467, 538 F.2d 865 (1976) (distinguishing between torts and takings; noting that government-induced flooding not proved to be inevitably recurring constitutes merely a tort); *National By-Products, Inc. v. United States*, 186 Ct.Cl. 546, 405 F.2d 1256 (1969) (finding that severe floodings resulting from government operation of a dam constituted a tort since floodings were shown to be isolated occurrences that would not inevitably reoccur); *Richard v. United States*, 152 Ct.Cl. 225, 282 F.2d 901 (1960) (taking of a seepage easement occurred when government raised the groundwater levels underneath agricultural zones in such a way as to cause neighboring land to become flooded since government knew that some seepage and accumulation of water was the natural consequence of defendant's act); *Berenholz v. United States*, 1 Cl.Ct. 620 (1982), *aff'd*, 723 F.2d 68 (Fed.Cir.1983) (holding that a compensable taking, and not a tort, occurred when the Army Corps of

---

**3.** Defendant argues in its Reply Brief in Support of Defendant's Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment that this court should not consider the line of case law dealing with government-induced floodings, stating that they are "of limit-ed value" and that the cases plaintiffs rely on are essentially inapposite. The court finds such cases valuable for setting an overall framework for the legal issues pertinent herein and for the standards to be applied distinguishing torts and takings in inverse condemnation cases.

Engineers removed a large section of a dike resulting in the loss of plaintiff's land due to erosion and flooding, despite government's repair efforts, since flooding of the land was the natural and probable consequences of defendant's action); *Pashley v. United States*, 140 Ct.Cl. 535, 156 F.Supp. 737 (1957) (finding that a taking had occurred when construction of a dam caused flooding to plaintiffs' property since defendant knew that impounding waters above the dam would cause property below the dam to become inundated).

■ In addition to the parties' reference to the volume of floodings cases that have been decided by this court and the United States Court of Appeals for the Federal Circuit (Federal Circuit), the case law distinguishing takings from torts has been reexamined and clarified in the recent decision, *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed.Cir.2003). In *Ridge Line*, the Federal Circuit discussed in detail the two-pronged test that must be utilized in distinguishing a taking from a tort in inverse condemnation cases. *Ridge Line* involved the government's construction of a postal service facility which allegedly caused an increase in storm water runoff and flooded Ridge Line's downstream neighbors. Plaintiff argued that, as a result, its flowage easement had been taken by inverse condemnation. The Federal Circuit found that the Court of Federal Claims' decision below focused solely on whether the government's action constituted a permanent and exclusive occupation and failed to consider "whether the increased water runoff constituted a taking of a flowage easement by inverse condemnation." *Id.* at 1355. Quoting *Columbia Basin Orchard v. United States*, 132 Ct.Cl. 445, 132 F.Supp. 707, 709 (1955), the court in *Ridge Line* then identified the two-part inquiry necessary, in the first instance, to determine when an action constitutes a taking as opposed to a tort. "First, a property loss compensable as a taking only results when the government intends to invade a protected property interest *or* the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury by the action.' " *Ridge Line, Inc.*, 346 F.3d at 1355 (emphasis add-

ed). "Second, the nature and magnitude of the government action must be considered." *Id.* at 1356. "Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner[']s right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Id.* (*citing Southern Pac. Co. v. United States*, 58 Ct.Cl. 428, 1923 WL 2123 (1923), *aff'd*, 266 U.S. 586, 45 S.Ct. 124, 69 L.Ed. 454 (1924)). If these factors are not sufficiently met, and the resultant damage is merely an incidental or consequential injury stemming from the government's action, then the action constitutes a tort over which this court has no jurisdiction. *Ridge Line*, 346 F.3d at 1356.

In meeting the requirements necessary to establish a taking, it is not sufficient for a party to overwhelmingly establish one, single prong of the *Ridge Line* test, and to completely forego proving the other. *See National By–Products, Inc. v. United States*, 186 Ct.Cl. 546, 405 F.2d 1256, 1274–75 (1969). In *National By–Products*, the Court of Claims determined that proving the government's unquestionable awareness of a potential injury (the first prong of *Ridge Line*) cannot, alone, suffice to constitute a taking where the plaintiff could not also establish a sufficient intrusion with respect to plaintiff's property rights (the second prong of *Ridge Line*). In that case, plaintiff failed to establish that the flooding which occurred on plaintiff's property would inevitably recur. *Id.*, 405 F.2d at 1274. Plaintiff in *National By–Products* urged the Court of Claims to look past this deficiency and focus solely on the fact that "the [g]overnment's foreknowledge of the consequences of the building" required a finding of a compensable taking. *Id.* The court, however, dismissed plaintiff's request, stating that "the [g]overnment's foreknowledge will not convert an otherwise insufficient injury into a taking. At most it could strengthen the plaintiff's case in tort action." *Id.* at 1275. Under the Court of Claims' analysis, the converse would obviously have been true, as well. That is, if plaintiff in *National By–Products* had presented

facts sufficient to overwhelmingly establish the second prong, but failed to demonstrate the government's foreknowledge of the consequences of its actions (the first prong), plaintiff would likewise have failed to satisfy the requirements necessary to find a compensable taking.

Although the dispute before the court in this instance does not concern a government-induced flooding, but rather the Air Force's use of TCE at the Base for aircraft maintenance and the migration of that contaminant through groundwater channels beneath the Base and onto plaintiffs' property, the standard set forth in *Ridge Line* should be applied since the Federal Circuit has identified the *Ridge Line* test as applicable in analyzing the court's subject matter jurisdiction in inverse condemnation actions. Accordingly, the court examines the facts at hand under the two-part analysis identified in *Ridge Line*, and its predecessors, below.

## A. Direct, Natural, or Probable Result

Since plaintiffs do not allege that the government intentionally appropriated their property, the court must determine whether plaintiffs have shown that the TCE contamination which migrated onto plaintiffs' property was the "direct, natural, or probable result" of the activities on the Base, as opposed to merely an "incidental or consequential injury" compensable as a tort under *Ridge Line*. In discussing whether an injury is the "direct, natural, or probable" result of an authorized activity, the *Ridge Line* court specifically directed this court to look at "whether the increased runoff in the claimants' property was the *predictable* result of the government action." 346 F.3d at 1356 (emphasis added) (*citing Sanguinetti v. United States*, 264 U.S. 146, 149–50, 44 S.Ct. 264, 68 L.Ed. 608 (1924)).[4]

In determining whether an injury is the "direct, natural, or probable" result of the authorized activity, the Federal Circuit's predecessor, the Court of Claims, prior to *Ridge Line*, also focused on the "foreseeability" of the resultant damage. *See, e.g., Eyherabide v. United States*, 170 Ct.Cl. 598, 345 F.2d 565 (1965). In *Eyherabide*, plaintiffs owned land surrounded on three sides by the Navy's gunnery range. *Id.*, 345 F.2d at 567. Plaintiffs sued the government arguing that the government's interference with their property was so great that it constituted a compensable taking under the Fifth Amendment. Plaintiffs alleged that their property had been taken due to a series of interferences— mainly the repeated dropping of fuel tanks and tow targets onto the plaintiffs' property; the entry of shells and rockets; damage and destruction of buildings and improvements. *Id.* at 569. The Court of Claims held that these invasions, among others, showed that defendant had appropriated the land for its own use. The court found that "the Government must be held responsible for the foreseeable consequences to the buildings and other improvements. That loss was not 'consequential damage' as the term is used in the law of eminent domain, but a direct physical invasion assignable to, because the natural product of, the dominion exercised over the tract by Navy servicemen and employees." *Id.* at 570. *See also Barnes v. United States*, 210 Ct.Cl. 467, 538 F.2d 865, 873 (1976) (finding that taking of a flowage easement was a natural consequence of government's release of dam waters where "defendant *anticipated* the creation of a delta and a rise in the groundwater elevations in the areas") (emphasis added); *Baird v. United States*, 5 Cl.Ct. 324, 330 (1984) (stating that "the probability and *foreseeability* of the damage is a primary determinative element in whether a taking or a tort occurred") (emphasis added).[5]

4. In the common use of the term, "predictable" means "capable of being predicted or foretold." Oxford English Dictionary Vol. XII, 335 (2d ed.1989). "Foreseeability" means "the quality of being reasonably anticipatable." Black's Law Dictionary 660 (7th ed.1999); *see also* American Heritage Dictionary 689 (4th ed.2000) ("foresee" means "[t]o see or know beforehand"); Oxford English Dictionary Vol. VI, 58 (2d ed.1989) ("foresee" means "[t]o see beforehand, have

prescience of"). The court further notes that in Burton's Legal Thesaurus, a synonym for predictable is "foreseeable." Burton's Legal Thesaurus 866 (3d ed.1998).

5. In *Baird*, the court found that there was no taking when unusual and unseasonal heavy rainfall caused the government to release stored water from a dam, causing overflow and seepage of river water onto plaintiff's property. 5 Cl.Ct. at

284

In *Bettini v. United States,* this court also referenced "foreseeability" in determining whether a taking had occurred when plaintiff's property was damaged after a federally owned road collapsed and caused a slide of mud, rocks, and highway materials to flow over the property. 4 Cl.Ct. 755 (1984). The *Bettini* court reasoned that in order for plaintiff to defeat defendant's motion to dismiss for lack of subject matter jurisdiction, the damage would have to have been the probable consequence of a deliberate governmental act. *Id.* at 760. The court denied the government's motion to dismiss, finding that:

> If plaintiff can show that the direct, *foreseeable*, and almost inevitable consequence of the construction of [the][r]oad would be collapse of the road or the slide of material onto plaintiff's property, the recovery based on inverse condemnation may be had. It is in the realm of factual possibility that the particular location involved here was such that a mudslide was a clearly *foreseeable* and probable result of constructing a road, or that the construction which took place was bound to collapse. Despite defendant's assertion that a road collapse is never the "natural consequence" of a highway project, the facts may prove otherwise.

*Id.* at 760–61 (emphasis added). In *Bettini,* the court determined that dismissal of plaintiff's case was not warranted without giving plaintiff the opportunity to show that the road collapse was in the realm of clear foreseeability. *Id.*

Similarly, the court in *Columbia Basin,* to which the Federal Circuit cited in *Ridge Line,* also looked to the "foreseeability" of the damage inflicted as a result of an authorized act in determining whether a taking had occurred. 132 F.Supp. at 711. In *Columbia Basin,* the Court of Claims found no taking when the government's construction of a dam caused excess water to be pumped into near-

by Orchard Lake. This construction caused water to overflow from Orchard Lake into a spring which plaintiff used to irrigate its orchard. Plaintiff alleged that when the orchard was irrigated with water from the spring, the alkali and salts discharged into it by the water from Orchard Lake exacerbated the already alkaline nature of the soil so as to create a condition in fruit trees planted in the orchard called plasmolysis. Consequently, plaintiff was forced to ultimately abandon its orchard.

The court found that the contamination of the spring waters by the waters from Orchard Lake, and the resultant damage to the trees, did not constitute a taking by the government. In particular, the Court of Claims noted that, at most, the discharge into the lake was a contributing factor to the overflow, but that it was not the direct, natural or probable result of authorized activity, since the unseasonal rainfall at that time was also a contributing factor. Furthermore, the court specifically noted that:

> [T]he Bureau of Reclamation ... could not have foreseen that the discharge of this water ... could have caused Orchard Lake to overflow or seep into plaintiffs' spring. Such seepage or overflow was not the direct, natural or probable consequence of the Government's act, and for this reason no intent to take can be implied. The most that can be said is that plaintiffs' spring was contaminated as the result of the negligence of the Government.

*Id.*[6]

Thus, this court must determine whether the contamination of the Modens' property was the foreseeably direct, natural, or probable consequence of the Air Force's use of TCE at the Base in the 1940s and 1950s such as to give rise to a compensable taking. In order for the contamination which occurred on the Subject Property to have been a

---

330. The *Baird* court found that despite permanent damage to property partially attributable to government activity, the excessively wet winter and spring was a unique occurrence that grew out of unusual climatic conditions. *Id.*

6. The *Columbia Basin* court also stated that "in no case has the Supreme Court ever indicated that accidental or negligent impairment of the

value of property constitutes a taking. They have never departed from the rule that there must have been an intent on the part of the Government to appropriate the property to the use of the public. An accidental or negligent impairment of the value of property is not a taking, but, at most, a tort ...." 132 F.Supp. at 710.

predictable or foreseeable consequence of the government's use of chemical solvents containing TCE at the Base, three occurrences would have had to have been foreseeable or predictable by the Air Force at the time of its authorized use of the chemical solvents. First, during the 1940s and 1950s, when the Air Force began cleaning airplanes and airplane parts at the Base with chemical solvents, the government would have had to have known that TCE was a component of these solvents and was a contaminant. It is this court's opinion that, under the previously discussed meaning of the terms "foreseeable" and "predictable," the court must assess the government's knowledge of TCE and its properties at the time of the authorized act in order to determine whether the results of the authorized act would have been foreseeable and predictable to defendant. Basing that determination upon today's knowledge of contaminants and their properties, some decades after the fact, would be inappropriate and singularly unhelpful inasmuch as it would not assist in assessing what was foreseeable in the 1940s and 1950s.

Defendant, in its submissions to the court, states that, at the time of the Base's use of TCE in the 1940s and 1950s, when the contaminant was allegedly introduced into the groundwater through the use of solvents containing TCE, no one had ever heard of TCE or knew that the solvents being used contained a contaminant which was a possible carcinogen. Def.'s Ex. 12, at ¶ 32; Def.'s Ex. 24 at p. 129. Plaintiffs have not contradicted the government's assertions or raised an issue of fact in this regard. *But cf. Clark v. United States,* 660 F.Supp. 1164, 1172–73 (W.D.Wash.1987) (finding, based on evidence presented, that the government was aware, prior to 1940, that TCE was not fit to consume and that substances like TCE should not be in a water supply). In fact, Dr. Rahn, plaintiffs' expert witness, agreed with the government's position, stating that he doubted that anyone in the 1940s and 1950s ever had heard of TCE. Pls.' Ex. 9, p. 129; Def.'s Ex. 18, p. 3. Accordingly, in the instant case, based upon unrefuted and unchallenged averments in this particular matter, the court must accept as true defendant's contention that at the time of the authorized actions, Air Force personnel did not know about TCE or its properties.

Next, plaintiffs would have to show that it would have been predictable or foreseeable by the government that these chemical solvents, containing TCE, would have released into the groundwater. Again, the evidence presented by the parties reflects that: (1) there was no accidental spill or intentional dumping of chemicals by the Air Force; (2) the Base had an industrial drainage system in place at Pride Hanger (where the cleaning of airplanes and airplane parts took place) to dispose of waste water and chemical solvents; and (3) both Pride Hanger and Building 8115 met and/or exceeded the requirements for use and storage under federal and state programs.

The above-described scenario is quite unlike the circumstances in the previously cited *Richard v. United States,* where the government knew that there would be seepage and a probable accumulation of water. *Richard,* 282 F.2d at 904. In *Richard,* while the government did not know exactly where the excess water would accumulate, it did know that someone's property would be affected— it was just a matter of whose property. Thus, in *Richard,* the court determined that there had been a taking of plaintiff's property. In the case at bar, however, the government had no reason to believe, at the time, that anyone's property would be affected by its use of chemical solvents at the Base.

Both parties and their experts have spent a great deal of time debating over the directional flow of the underground paleochannels from the Base to the Subject Property. Plaintiffs' expert believes that had the government, during the 1940s and 1950s, performed a detailed study, defendant would have been able to determine whether the directional flow of those channels would have taken the TCE to the Modens' property. This point, however, begs the question of why the government would have ever thought it necessary, at that time, to have commissioned such a study. This issue takes us to the third subject requiring foreseeability on the part of the government. Plaintiffs would have to show that the government

should have foreseen that the contaminant would naturally migrate towards plaintiffs' property.

This third point is the crux of virtually all of plaintiffs' argument and is the primary matter that the parties focus on in their pleadings. Plaintiffs' expert, Dr. Rahn, concluded that had the government conducted an extensive hydrogeological investigation, such an investigation would have revealed that contaminants from the Base would move in an east-southeasterly direction towards the Modens' property due to the existence of historically documented paleochannels in the bedrock. Defendant, however, offers a differing point of view in this regard. Defendant alleges that because the surface water runs in a southerly direction, and not eastwardly, it was not foreseeable that the groundwater would migrate towards the Subject Property, especially in light of the overall topography of the area, which defendant contends slopes southward.

Despite the parties' differences with regard to this point, and even if the court were to assume, without deciding, that plaintiffs' position is correct, i.e., if the government had performed a detailed hydrogeological investigation it would have discovered that the underground channels ran toward the Subject Property, plaintiffs still could not demonstrate that the contamination of the Modens' property was the foreseeably direct, natural, or probable consequence of the Air Force's use of TCE at the Base. This is so because at the relevant time: (1) there was no reason to believe that the cleaning solvent used by the Air Force was releasing into the groundwater (the drainage system was in place and there were no spills); and (2) since no one was aware or should have been aware that the cleaning solvent used by defendant contained a contaminant, the government had no reason to commission the hydrogeological investigation which Dr. Rahn contends would have demonstrated that existing underground channels would move any contamination plume towards the Subject Property. As stated, the nature of TCE was not generally known in the 1940s and 1950s (at the time it was first used at the Base), and the contamination plume was not detected until

1998, decades after the authorized activity by the Air Force here in dispute.

Plaintiffs and their expert witness base their argument, that a hydrogeological investigation would have revealed an underground channel flow towards the Modens' property, completely upon a perspective of hindsight of what the parties know now. If, during the 1940s and 1950s, when TCE was being used to clean the airplanes and airplane parts, the government had then known that TCE was a contaminant and if, at that time, the Air Force had reason to have suspected that the TCE was escaping into the groundwater, then it would have been reasonable to expect the government to have performed the extensive hydrogeological investigation prescribed by Dr. Rahn. Perhaps, at that point, as plaintiffs strenuously argue, such a study would have revealed that the underground channels did run towards the Modens' property, thus placing the Air Force on notice of a potential danger to the Subject Property. Specifically, the Air Force might then have been deemed to have knowledge that the foreseeable result of TCE escaping into the groundwater would ultimately have been the contamination of the Subject Property. Such a scenario, however, presents the exact opposite of the facts in this case. Here, at the time of the authorized action (i.e., the use TCE), the Air Force was unaware and had no reason to be aware of the harmful properties of the solvent being used or that the contaminant in the solvent was being released into the groundwater at the Base. Thus, the contamination we discuss in the present day was not foreseeable at the time of the Air Force's authorized action of using the cleaning solvent and it is only through the benefit of hindsight that we are now able to identify what steps would have been necessary to place the Air Force or any one else on notice of the problem when it originally occurred.

Plaintiffs rely heavily upon *Clark v. United States* in support of their assertion that their takings claim should go forward based upon the facts as alleged in the present case. 19 Cl.Ct. 220 (1990). Although many of the facts in *Clark* are strikingly similar to the facts *sub judice*, the court notes that the decision in *Clark* is not controlling with re-

gard to this matter and it should not be followed in this instance. In the first *Clark* case, *Clark v. United States*, 8 Cl.Ct. 649 (1985) (*Clark I*), in a suit filed before this court on December 3, 1984, plaintiff, Mary L. Clark, alleged that the Air Force caused dangerous chemicals and contaminants to flow from a waste dump at McChord Air Force Base in Washington state, into plaintiff's water supply, causing her water supply to become unsafe for human consumption. *Id.* at 650. The plaintiff in *Clark I* alleged that the contamination of her water supply diminished the market value of her property and resulted in a compensable taking under the Fifth Amendment. As in the present case, it was undisputed that the dumping of chemicals in *Clark I* was authorized by the Air Force.

The plaintiff in *Clark I*, after initiating suit in this court, also filed (with other plaintiffs) a complaint in district court on February 8, 1985, alleging the same facts and seeking tort damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.* The United States Claims Court (Claims Court), after applying basically the same test as described in the instant case to determine "whether governmental action destructive of the value

of private property is a taking or merely a tort," held that the landowner's pleadings raised sufficient issues of material fact with respect to whether the contamination constituted a taking or a tort such that the government's motion for summary judgment on jurisdictional grounds was precluded and the parties were ordered to proceed with the case. *Id.* at 652–653.[7]

However, prior to any determination by the Claims Court with regard as to whether plaintiff's claim constituted a tort or a taking, the district court found that plaintiffs had successfully demonstrated a tort under the FTCA. *See Clark v. United States*, 660 F.Supp. 1164 (W.D.Wash.1987) (*Clark II*). The district court held that the government's failure to operate its dump sites and burn pits on the base in accordance with state and government regulations resulted in the seepage of hazardous waste, which was the proximate cause of the contamination of plaintiffs' property. Plaintiffs were awarded damages for loss of rental income, diminution of property values, loss of quiet use of enjoyment, etc.[8]

The plaintiffs' victory in the tort action in the district court did not, however, end the matter. In addition to the damage award

---

7. The *Clark I* court stated that the test to be applied in determining whether governmental action destructive of the value of private property is a taking or merely a tort is: (1) whether the actions of the government officials were authorized; (2) whether the actions which caused the loss to plaintiff's property were deliberate or intentional; (3) whether the invasion of plaintiff's property was a natural, probable or foreseeable consequence of the governmental acts; and (4) whether the injury to plaintiff's property is relatively permanent or indefinite, or although intermittent, is likely to be recurring rather than random. 8 Cl.Ct. at 652.

8. It is appropriate to note that *Clark* is not the only instance in which TCE inflicted damage to property has been litigated under the FTCA. For example, in *Aragon v. United States*, the Air Force established an airbase in New Mexico in 1942. 146 F.3d 819 (10th Cir.1998). At that time, the military washed aircraft and aircraft engines with TCE, which was known to be a degreasing agent used by the military. In 1967, the government deactivated the Base. In 1991, the New Mexico Environmental Department detected TCE in plaintiffs' wells located near the Base's east boundary. The Army Corp of Engineers subsequently identified the probable source of contam-

ination at the base site. The plaintiffs filed claims with the Air Force for compensation, including diminution of property value, under the FTCA. However, the Tenth Circuit determined that the discretionary function exception to the FTCA precluded recovery in that the Air Force had discretion regarding its handling and disposal of wastewater from its aircraft washdown operations. *Id.* at 826.

In another case, not specifically involving TCE, but analogous nonetheless, the Eastern District of Pennsylvania addressed the issue of contamination of the township's water well as the result of a release of hazardous substances from the Naval Air Warfare Center in Warminster, a facility placed on the EPA's National Priorities List. *Warminster Township Municipal Authority v. United States*, 903 F.Supp. 847 (E.D.Pa.1995). Plaintiff alleged that hazardous substances migrated through the soil from the NAWC's waste disposal site, resulting in contamination of the well. Plaintiff sued under CERCLA and the FTCA. With respect to the FTCA claim, the district court held that while the injury was considered to be permanent, and not continuous, plaintiff failed to file the appropriate administrative claim within the FTCA's two-year statute of limitations period. *Id.* at 851.

she had received in the district court, Mary Clark argued before this court that she should also receive relief for her takings claim before the Claims Court. *See Clark v. United States,* 19 Cl.Ct. 220 (1990) (*Clark III* ) The court, in *Clark III,* correctly ruled that based on the same set of operative facts, where the plaintiff had already recovered damages under the Federal Tort Claims Act in district court, she was precluded from additional recovery pursuant to a Fifth Amendment takings claim under the Tucker Act before the United States Claims Court. *Id.* at 224–25.

This court is in full agreement with the foregoing ruling as set forth in *Clark III.* However, although urged by plaintiffs in the present case to do so, this court declines to adopt the viewpoint set forth in dictum by the *Clark III* court, opining that the same operative facts may give rise to both a taking and a tort. *Id.* at 223–24. It is this court's opinion that the standard set forth in *Ridge Line* and the long line of precedent cases which have articulated the test to determine whether a claim sounds in tort under the FTCA or whether it is a Fifth Amendment takings case is a sound one which militates against such a viewpoint. *See, e.g., National By-Products, Inc. v. United States,* 186 Ct. Cl. 546, 405 F.2d 1256, 1273–74 (1969); *Columbia Basin Orchard v. United States,* 132 Ct.Cl. 445, 132 F.Supp. 707, 709 (1955); *B.W. Parkway Assocs. Ltd. v. United States,* 29 Fed.Cl. 669, 676–77 (1993). Accordingly, plaintiffs' reliance upon *Clark III* does not further their cause here.

Plaintiffs also generally cite to *Berenholz v. United States,* 1 Cl.Ct. 620 (1982). In *Berenholz,* the plaintiffs' land was eroded and flooded as a result of governmental action. There, the Army Corps of Engineers had removed a very large section of a dike which protected plaintiffs' property in order to allow trucks and equipment to pass through to repair the dike from damage caused by severe weather. The government rebuilt the section of the dike that had been removed, but the dike was not returned to its previous effective state. Portions of the dike began to erode, causing flooding to plaintiffs' property. The government argued that plaintiffs' cause of action was merely one of negligence on the part of the government and, consequently, sounded in tort. *Id.* at 626. The court noted that "the key element which distinguishes a taking from an accidental injury is the presence on the part of the government of an intent to appropriate." *Id.* (citations omitted). To show an intent to appropriate, the facts need only demonstrate that the invasion of property rights was the result of acts the natural and probable consequences of which were to effect such enduring invasion." *Id.* (*citing Columbia Basin,* 132 F.Supp. at 709).

In *Berenholz,* the court went on to explain that "the fact is that almost immediately after the repairs were made, the dike began to erode at the breach point. Common sense suggests that despite defendant's contractor's best efforts, he could not have been expected to restore the clay dike to its proper integrity after an entire 35–ft. center section had been removed .... Thus, once the dike was compromised, the subsequent erosion at the breach point and the flooding of the land were the natural and probable consequences of defendant's action." *Berenholz,* 1 Cl.Ct. at 628. The Claims Court held that the overflow was the direct result of government activity and that the dike would not have failed if the defendant had not ordered such a large section of the dike to be removed. *Id.* at 630.

The facts in *Berenholz* differ significantly from the case at bar. In *Berenholz,* the court determined that it was foreseeable, *i.e.,* obviously apparent by using common sense, that if the government removed such a large piece of the center dike it would be impossible to restore the structural integrity of the dike. Thus, the court stated that repairs to try and offset the damage to the dike would have clearly been useless—once the dike was compromised, the erosion and flooding which occurred were the natural and probable consequences of that compromise. In contrast, in the case at bar, at the time of the Air Force's use of chemical solvents and degreasers at the Base, defendant had no reason to believe or anticipate that a chemical contained in the solvent that Air Force personnel used to clean the airplanes would be

released into the groundwater and migrate toward the Subject Property. Therefore, the present case differs from *Berenholz* in terms of the "foreseeability" of the authorized action resulting in damage to plaintiffs' property.

Plaintiffs also cite to *Pashley v. United States* in support of their takings claim. 140 Ct.Cl. 535, 156 F.Supp. 737 (1957). In *Pashley*, plaintiffs alleged that their property was flooded and the mining of sodium sulphate was destroyed as a result of the government's construction of a dam, although, there was no claim that the dam was improperly designed or constructed. At the time of construction of the dam "[d]efendant knew that the impounding waters above the dam would probably cause the property below the dam to be inundated. This is evidenced by the fact that [the government] went to great pains to prevent the water from seeping through it. But whatever precautions were taken, the land was flooded nonetheless." *Id.*, 156 F.Supp. at 738. The court found a taking of plaintiffs' property in this instance, requiring the government to pay compensation. Here, however, the present case differs from *Pashley* as well. In *Pashley*, the government had foreseen or knew of the probable damage to plaintiffs' property as a result of building the dam, and in fact, had taken special precautions to try and eliminate that risk. *Id.* In the present case, though the government used established and reasonable standards to care for, store, and dispose of the chemical degreasers, no one at the Base had reason to be concerned about any risk of the chemicals being released into the groundwater. There is no evidence presented by the parties suggesting that seepage was an anticipated risk. In fact, to date, although both parties acknowledge the likelihood that the contamination originated from the Base, the parties cannot state so with certainty.[9]

In view of the foregoing, the court cannot find that the government's use of chemical compounds at the Base in the 1940s and 1950s would foreseeably or predictably lead to present-day contamination of a property located approximately five miles away from the alleged source of the contamination. The court finds this true especially since the Base had an adequate drainage system and storage facilities in place to properly handle chemicals; there is no evidence of any spill or intentional release of chemicals by the government; storage and use practices at the base met or exceeded state and federal requirements; and the source of contamination is still not definitively known to originate from the Base. Inasmuch as the TCE contamination which migrated onto the Modens' property was not the direct, natural, or probable result of the Base's activities, plaintiffs' claim is not a taking, but at most, a tort over which this court lacks jurisdiction.

### B. Nature of the Governmental Action

Without having established the first prong of *Ridge Line*, plaintiffs' case at this point is foreclosed. *See National By–Products*, 405 F.2d at 1275. However, the court will engage in a very brief discussion regarding the extent to which the parties have addressed the second prong of *Ridge Line*, although no ruling will be made in that regard. As stated, the second prong of *Ridge Line* inquires as to the nature and magnitude of the government action. Specifically, it requires the court to determine whether the government's alleged interference with any property rights is substantial and frequent enough to rise to the level of a Fifth Amendment taking.[10] In

9. The court observes that there is even an unchallenged averment by defendant that prior to the establishment of the Base, a private airport had previously existed at the location. Def.'s Ex. 22 at p. 71; Pls.' Ex. 5 at p. 71–72. Thus, the identification of yet another possible culprit lends to another potential twist in the unsuccessful attempts to definitively and conclusively identify the source of the contamination.

10. The *Ridge Line* court references a line of case law on the frequency and intermittence of invasions of property in government-induced floodings cases in that regard. *See Ridge Line*, 346 F.3d at 1357. As stated previously, the instant matter is not a floodings case. Therefore, while the court recognizes the relevance of some aspects of the case law pertaining to floodings, in accordance with the manner of taking here alleged, the court's review of property invasion should entail an examination of the overall degree of intrusiveness with respect to plaintiffs' property rights, as opposed to the frequency and intermittence of invasions of property specifically appropriate in floodings cases.

evaluating the level of interference with property rights, a taking normally involves factual circumstances which demonstrate extreme or significant governmental intrusiveness, permanent infringement, or even if temporary, an exercise of dominion and control over a private party's property interests. *See R.J. Widen Co. v. United States*, 174 Ct.Cl. 1020, 357 F.2d 988, 993 (1966) (a taking is sufficiently shown "if the action involves a direct interference with or disturbance of property rights....[a]nd 'it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking'"); *Palm v. United States*, 835 F.Supp. 512, 517 (N.D.Cal.1993)("extreme and permanent ... intrusiveness ... seems characteristic of most taking claims") (*citing United States v. Dickinson*, 331 U.S. 745, 747, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947)); *B.W. Parkway Assocs. Ltd. v. United States*, 29 Fed.Cl. 669, 676–77 (1993) (if a plaintiff alleges permanent or continuing injuries, the cause of action is more likely to be a takings claim).

In the present case, plaintiffs allege "a permanent and substantial interference with [p]laintiffs' use and enjoyment of the [Subject] Property." Compl. ¶ 10. In particular, plaintiffs allege an indefinite pollution of their property stemming from the fact that the TCE contamination plume will remain on the Subject Property for at least the Modens' lifespan. As alleged, this assertion proffers far more than a mere trespass with regard to the nature of the government action at issue. Plaintiffs also allege that because of this contamination, the value of the Subject Property has diminished and that there has been an overall decrease in marketability. Defendant does not dispute that the TCE plume still remains underneath plaintiffs' property.

While elaborating upon the damage claimed by plaintiffs, the court should not overlook the government's efforts at remediation in this matter. By 1992, the Air Force had begun providing residents whose property was south of the Base with an alternate water supply after it was determined that TCE was possibly contaminating those residents' drinking water. The Air Force en-gaged in an extensive cleanup program, costing approximately $61,358,000, in order to avoid further migration of chemical contaminants to on-base and off-base groundwater, including $1,800,000 to provide landowners east of the Base with clean, potable water. The Air Force also gave plaintiffs additional water hookups to allow plaintiffs to develop the Subject Property if they decide to do so in the future, though plaintiffs contend that these additional hookups will not suffice for plaintiffs to fully develop their land. Nevertheless, both parties agree that a Final Five Year Review, published September 19, 2000, reflects that the Air Force's remediation plan is working well.

Based on all of the evidence presented to date and despite the extensive remediation efforts on the part of the Air Force, the court acknowledges that the invasive nature of the contamination appears to be quite significant. However, because plaintiffs have not demonstrated that the contamination of the Subject Property was a direct, natural, or probable consequence of the Air Force's use of TCE in maintenance activities, subject matter jurisdiction is lacking, even if the TCE contamination plume constitutes a continuous and permanent interference with the Subject Property.

## C. Other Relief

Defendant argues that dismissal of plaintiffs' lawsuit is appropriate here because plaintiffs have a remedy under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, and this statute is plaintiffs' exclusive remedy. Having found that the facts herein constitute a tort and not a taking for the purpose of determining subject matter jurisdiction, it appears that, unfortunately, the plaintiffs in this case, unlike the plaintiff in *Clark*, did not preserve their rights under the FTCA. The court does not speculate as to the reason that plaintiffs failed to consider this option. However, regrettably, this court must decline to accept plaintiffs' cause of action, although, plaintiffs have stated that the two-year statute of limitations under the FTCA has passed. In that eventuality, while this court would not presume to proffer a recommendation, the court ob-

serves that the Federal Courts Improvement Act of 1982, as amended by 28 U.S.C. §§ 1492 and 2509, authorizes either House of Congress to refer bills to the Chief Judge of the Court of Federal Claims as congressional reference cases. 28 U.S.C. §§ 1492, 2509(a). The court simply notes that the foregoing might be appropriate for consideration by plaintiffs in this instance as a possible avenue of relief.

## CONCLUSION

For the following reasons, it is hereby **ORDERED** that:

(1) Defendant's Revised Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment, filed December 20, 2002, is **GRANTED**;

(2) The Clerk's office is **DIRECTED** to **ENTER** judgment for defendant, dismissing plaintiffs' complaint for lack of subject matter jurisdiction; and

(3) Each party shall bear its own costs.

